UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| FOUNDATION FOR GLOBAL SUSTAINABILITY, TENNESSEE CITIZENS FOR WILDERNESS PLANNING, TENNESSEE SCENIC RIVERS ASSOCIATION, NUCLEAR INFORMATION AND RESOURCE SERVICE, COMMUNITY DEFENSE OF EAST TENNESSEE, AND SOWING JUSTICE, | ) ) ) ) ) ) ) ) ) ) | Civil Action No.<br><br>COMPLAINT |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,<br>  1200 Pennsylvania Avenue NW<br>  Washington, D.C.  20460 | ) ) ) ) ) | |
| and | ) ) | |
| UNITED STATES DEPARTMENT OF ENERGY,<br>  1000 Independence Avenue SW<br>  Washington, D.C.  20585 | ) ) ) ) ) | |
| Defendants. | ) | |

**INTRODUCTION**

1. The Oak Ridge Reservation (ORR) is a U.S. Department of Energy (DOE) facility covering about 34,000 acres near Knoxville, Tennessee.  ORR is bounded on the north and east by the city of Oak Ridge, and on the south and west by the Clinch River.

2. The facility originally was part of the Manhattan Project and has for decades processed material for use in nuclear weapons.

3. Various activities over time at ORR caused releases of non-radioactive and radioactive hazardous substances, pollutants and contaminants throughout the facility.

1

These releases also have contaminated, and continue to contaminate, surface water and sediment inside and outside of ORR's property boundaries.

In 1989, the U.S. Environmental Protection Agency (EPA) placed the site on the national priorities list (NPL) pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA).

As required by CERCLA §120, a federal facility agreement (FFA) was signed in 1991and became effective in 1992; the FFA was signed by DOE, EPA, and the Tennessee Department of Environment and Conservation (TDEC). The CERCLA cleanup at ORR is governed by the terms of the FFA, which explicitly requires that the cleanup be carried out in accordance with CERCLA, its implementing regulations, and EPA policy and guidance, as well as in accordance with Tennessee state law.

A recent report by the U.S. Government Accountability Office estimates the final cleanup cost of this site to be in excess of $30 billion, with a projected completion date of 2047.

Part of the ORR cleanup involves construction and operation of large landfills to dispose of hazardous substances, pollutants, and contaminants associated with CERCLA response actions. These landfills generate wastewater discharges into water bodies in and around ORR.

Plaintiffs are past, current, or potential recreational users of Bear Creek and other bodies of water in and around ORR.

Due in part to actions by former EPA Administrators Andrew Wheeler and Michael Regan, EPA and DOE are implementing CERCLA cleanup actions which violate requirements in CERCLA and the National Contingency Plan (NCP), violate non-

discretionary duties in CERCLA, violate the express terms of the FFA, and are arbitrary, capricious, an abuse of discretion and not otherwise in accordance with law.

4. CERCLA authority to carry out a cleanup at a federal facility like ORR does not provide a basis or a justification for federal agencies to ignore, undermine or weaken standards and requirements promulgated under other federal and state law, especially where those standards and requirements are designed to ensure a minimum floor of protectiveness of human health and the environment for users of recreational waters everywhere throughout the United States.

5. The actions by EPA and DOE currently expose Plaintiffs, and will continue to expose Plaintiffs in the future, to unsafe levels of contamination in waters designated by the State for recreational use under the CWA.

6. The Plaintiffs seek relief from this court that will compel faithful performance of the FFA, will compel EPA and DOE to faithfully carry out the requirements in CERCLA and the NCP, and will compel EPA and DOE to discharge their non-discretionary duties under CERCLA and the NCP, resulting in a cleanup at ORR that complies with the law, is in accordance with CERCLA, the NCP and EPA policy and guidance, is in accordance with Tennessee law, and is not arbitrary and capricious, an abuse of discretion and not otherwise in accordance with law, based on the Administrative Record.

**JURISDICTION**

7. This court has subject matter jurisdiction over this action pursuant to 42 U.S.C. §§ 9659(a)(1) and (a)(2), 42 U.S.C. § 9613(j), and 28 U.S.C. § 1331. This case involves a civil action arising under the laws of the United States including CERCLA, 42 U.S.C. §

9601, *et. seq*., the NCP, 40 C.F.R § 300.400, *et. seq*., and the FFA, which was adopted pursuant to 42 U.S.C. § 9620.  Pursuant to 40 C.F.R. § 374, Plaintiffs served notice of intent ot file this action on the appropriate individuals by certified mail, return receipt requested. The last notice to be received was received by Attorney General Merrick Garland and Jennifer Granholm, Secretary of Energy, on August 29, 2024. A copy of the notice letter and return receipts are hereto attached.

8. Jurisdiction is also proper in this Court pursuant to 28 U.S.C. §§ 2201 and 2202, which authorizes declaratory and injunctive relief, respectively. This Court is also authorized to grant relief under 5 U.S.C. § 706, and 28 U.S.C. § 2202.

9. This court has personal jurisdiction over the defendants pursuant to 42 U.S.C. § 9613(b), which grants exclusive original jurisdiction over all controversies arising under CERCLA to the United States district courts.

10. Plaintiffs are "persons" as defined by 42 U.S.C. § 9601(21).

### VENUE

11. Venue is proper in this District under 42 U.S.C. § 9613(b), 42 U.S.C. § 9659(b), and 28 U.S.C. § 1391(b).  Final CERCLA remedy selection decisions related to the release and threatened release of hazardous substances, pollutants and contaminants into the environment which form the basis of the Plaintiff's claims were made by EPA Administrators pursuant to CERCLA § 120 authority, and EPA and DOE both reside in the District of Columbia for purposes of this action. The violations of the FFA and of law, and failure to carry out non-discretionary duties, by both agencies took place within this District.

12. Plaintiffs provided proper notice of their intent to file this action in accordance with 40 CFR § 374. A copy of the notice is attached hereto.

## PARTIES

**Plaintiffs**

Foundation for Global Sustainability

13. Foundation for Global Sustainability is a transdisciplinary, non-profit advocacy organization. It works to restore the balance between human activities and the natural life support systems of the Earth. Foundation publications, special reports, events and outreach inform and educate the public about vital regional and global issues and how they interdepend. The Foundation monitors and addresses social and environmental issues in the Upper Tennessee Valley and the Southern Appalachian Mountains.

14. The Foundation's Vision is for a healed planet whose inhabitants enjoy life, liberated of privation, in harmony with each other and Mother Nature. Its Mission is encouraging and enabling individuals to bring about an equitable, sustainable future. Nuclear Reservation.

Tennessee Citizens for Wilderness Planning

15. Tennessee Citizens for Wilderness Planning is a non profit organization dedicated to achieving and perpetuating protection of natural lands and waters by means of public ownership, legislation, or cooperation of the private sector. While our first focus is on the Cumberland and Appalachian regions of East Tennessee, our efforts may extend to the rest of the state and the nation. TCWP's strength lies in researching information pertinent to an issue, informing and educating our membership and the public, interacting

with groups having similar objectives, and working through the legislative,

administrative, and judicial branches of government on the federal, state, and local levels.

Tennessee Scenic Rivers Association

16. Tennessee Scenic Rivers Association is a non-profit organization of paddlers

and river users who work to protect clean water and free-flowing rivers in Tennessee. The

members strive to make paddling contagious by having fun while growing appreciation

for our rivers. From flat water to white water, members can be found cleaning waterways,

paddling, building access sites, teaching skill clinics, and supporting conservation efforts.

Nuclear Information and Resource Service

17. Nuclear Information and Resource Service (NIRS) is a national non-profit

organization devoted to a nuclear-free, carbon-free world. NIRS has served as the

information and networking hub for people and organizations concerned about nuclear

power, radioactive waste, radiation, and sustainable energy issues since 1978. It works

internationally to create a sustainable energy future without nuclear power, and are

affiliated with the World Information Service on Energy (WISE) International.  NIRS

supports a nuclear free, carbon free sustainable energy future; a democratically-based

energy system in which communities are empowered to make decisions about their

energy sources; environmental justice; a just transition that addresses the needs of

communities during the progression from nuclear energy and fossil fuels to renewable

energy; and prevention of and protection from exposure to radiation.

Community Defense of East Tennessee

18. Community Defense of East Tennessee (CDET) is a grassroots, community-

based organization dedicated to ending mass incarceration. Together with families, CDET

is committed to fostering education, liberation, support, and empowerment, while actively confronting injustices and advocating for equity, social change, and restoration. Its central goal is to dismantle the prison pipeline and shift our communities away from punitive models that prioritize punishment, towards more compassionate approaches that prioritize healing individuals and communities alike. CDET strives to create systems that facilitate restoration, healing, and transformation. Through comprehensive education, support, and community training in various facets of social justice, CDET believes we can break the perpetual cycle of harm within our community.

19. CDET is supporting efforts to hold the Environmental Protection Agency (EPA) and Department of Energy (DOE) accountable for their plans to bury radioactive and hazardous waste from the Oak Ridge Reservation cleanup at the new Environmental Management Disposal Facility (EMDF). Despite the existing nuclear landfill that has been receiving waste and releasing radionuclides and pollutants to surface water since the 1990s, the new EMDF poses even greater risks. This federally owned 37,000 acre land in Roane and Anderson County is the original site of the government's top-secret atomic weapons program starting in 1942. CDET views environmental justice as a critical issue that intersects with social justice, as the side effects of pollution often lead to behavioral issues that become entangled with the criminal justice system through punishment in school and incarceration. Communities of color are disproportionately affected by pollution, facing higher exposure to toxic substances that can lead to neurological and behavioral problems. These health disparities exacerbate existing social inequalities, leading to higher rates of punitive measures within the criminal justice system. The compounding effects of environmental and carceral injustices perpetuate a cycle of racial

disparities, as marginalized communities bear the brunt of both ecological harm and harsh punishment systems. Addressing environmental justice is therefore essential to breaking this cycle, ensuring healthier communities and a more equitable society.

Sowing Justice

20. The mission of Sowing Justice is to utilize Environmental Justice principles to increase civic engagement beyond voting with organizing tools and resources for healthy and safe communities. Sowing Justice connects communities with resources and tools that empower engagement in local, state, and federal policies that foster healthy and safe communities where people live, learn, work, worship, and recreate.

21. Sowing Justice expand the coalition of environmental justice communities by providing engagement strategies and tools for implementing policies. Its resources and tools foster high information civilly engaged communities that seek transparency and accountability of decision-making processes.

22. The vision of Sowing Justice is to use citizen science and voter registration to increase civic engagement to address environmental racism and injustice to increase advocacy to support policies that create a legacy of clean air, water, and soil right now and for generations to come.

**Defendants**

Environmental Protection Agency

23. The Environmental Protection Agency is an executive department of the U.S. government headquartered in the District of Columbia, and is the federal agency that took the unlawful and improper action that is the subject of this complaint.

Department of Energy

24. The Department of Energy is an executive department of the U.S. government headquartered in the District of Columbia, and is the federal agency that took the unlawful and improper action that is the subject of this complaint.

## STANDING

25. Each of the Plaintiff organizations have associational standing because at least one of its members would have standing to sue in his or her own right, the interests the organization seeks to protect are germane to its purpose, and neither the claims asserted in this action nor the relief requested requires that an individual member of the organization participate in the lawsuit. *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002). In order for a member of the organization to have standing, it must be shown that the member would suffer a probable injury-in-fact to the member's interests that is caused by the Defendant's actions complained of, and that a favorable decision in this action will redress the alleged injury. The declarations attached hereto establish satisfaction of these requirements for standing.

## STATUTORY AND REGULATORY BACKGROUND

26. In 1980, Congress capped off a highly productive decade of developing major federal environmental legislation by enacting the Comprehensive Environmental Response, Compensation, and Liability Act.  The statute complemented the other federal environmental laws, which are largely regulatory in nature, by providing the President with broad cleanup authorities.

27. EPA has published the National Contingency Plan at 40 CFR Part 300, a regulation which establishes the regulatory "blueprint" for carrying out response actions under CERCLA and other federal environmental laws.  The NCP has been updated a

number of times over the years, in part to reflect amendments made to CERCLA and other federal environmental laws.

28. In 1986, Congress amended CERCLA by adding several new sections to the existing statute. New CERCLA § 121 includes numerous important requirements and duties related to the selection of CERCLA remedial actions. Among other things, CERCLA § 121 mandates attainment of "applicable or relevant and appropriate requirements" (ARARs) promulgated under federal and more stringent state law, mandates selection of CERCLA remedies which are protective of human health and the environment, and mandates a preference for treatment to the "maximum extent practicable."

29. The Clean Water Act is specifically identified in CERCLA § 121(d) and in the NCP as one of the federal laws that serve as ARARs, and is one of the most important potential ARARs at CERCLA cleanup sites. The ARAR status of the Clean Water Act and its implementing regulations is addressed in great detail in a number of EPA policy statements and guidance documents.

30. A primary purpose of the Clean Water Act (CWA) is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA is designed to provide a uniform and comprehensive national approach to water protection, and as such, to protection of human health and the environment.

31. According to regulations published by the U.S. Environmental Protection Agency, CWA purposes include ensuring "water quality for the protection and

propagation of fish, shellfish and wildlife and for recreation in and on the water." 40

C.F.R. § 131.2.

32. The scope of the protection ensured by the CWA includes recreational

fishermen and other users of Bear Creek and other bodies of waters in and around ORR,

which have been lawfully designated by the State of Tennessee for recreational use

pursuant to its delegated CWA authority.

33. The primary manner of achieving the purposes and objectives of the CWA is

by prohibiting and regulating the discharge of pollutants into "navigable waters," which

the Act defines broadly as "the waters of the United States." Id. § 1362(7).  According to

long-standing published EPA policy guidance, the use of best available technology (BAT)

"is the major national method of controlling the direct discharge of toxic and non-

conventional pollutants to waters of the U.S."  Other long-standing published EPA policy

guidance makes it clear that "[t]echnology-based effluent limitations (TBELs) aim to

prevent pollution by requiring a minimum level of effluent quality that is attainable using

demonstrated technologies for reducing discharges of pollutants or pollution into the

waters of the United States."

**FACTUAL AND LEGAL BACKGROUND**

34. The Oak Ridge Reservation is a U.S. Department of Energy facility covering

about 34,000 acres near Knoxville, Tennessee. ORR is bounded on the north and east by the

city of Oak Ridge, and on the south and west by the Clinch River. The facility, which

originally was part of the Manhattan Project, was used to enrich uranium and separate

plutonium for use in nuclear weapons for the military during World War II.  Large

volumes of hazardous substances, including radioactive, non-radioactive and mixed

(radioactive and non-radioactive) hazardous substances have been generated, leaked, and released at the facility.  There are hundreds of contaminated areas at ORR, including contaminated ground water, as well as contaminated surface water and sediments in streams and other waters in and adjacent to ORR.  Waters impacted by ORR contamination include Bear Creek, Lower East Fork Poplar Creek, the Poplar Creek/Clinch River and the lower Watts Bar Reservoir of the Tennessee River.

35. In 1989, the U.S. Environmental Protection Agency placed ORR on the National Priorities List pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§9601 et seq.  As required by CERCLA §120, a Federal Facility Agreement was entered into in 1992; the FFA was signed by DOE, EPA, and the Tennessee Department of Environment and Conservation. The CERCLA cleanup at ORR is governed by the terms of the FFA. A recent report by the U.S. Government Accountability Office estimates the final cleanup cost to be in excess of $30 billion, with a projected completion date of 2047.

36. The CERCLA cleanup at ORR has been divided into 56 operable units (OUs) spread out over five watershed cleanup areas. Two of these watershed areas—Bear Creek Valley and Upper East Fork Poplar Creek—are impacted by one 800-acre portion of the ORR facility, the Y-12 National Nuclear Security Complex (Y-12). Y-12 is an active federal manufacturing and storage facility that is used to manufacture parts for nuclear weapons and for uranium processing. The cleanup at Y-12 includes demolition of highly contaminated buildings no longer in use, as well as the construction of a large-scale water treatment plant to control the migration of mercury from ORR into East Fork Poplar Creek.  In addition to actions to address surface water contamination, DOE is carrying out

12

groundwater studies to determine the extent of contamination (including migration of contaminated groundwater off-site) that may require remediation.

37. In 1999, DOE issued a CERCLA Record of Decision (ROD) that selected the construction of the Environmental Management Waste Management Facility (EMWMF) landfill to dispose of wastes and debris associated with the building demolition activities at ORR. This existing landfill, which has an estimated capacity of 2.3 million cubic yards, began receiving wastes in 2002. DOE has estimated that it will reach its disposal capacity in the "late 2020's."

38. As part of its operations, EMWMF generates contact water (e.g., water that becomes contaminated when rain comes in contact with as-yet uncapped solid and/or CERCLA cleanup waste and hazardous substances, including mercury, polychlorinated biphenyls (PCBs), and radionuclides).

The Wastewater Dispute

39. In 2016, TDEC initiated an informal dispute pursuant to the FFA regarding a draft "Focused Feasibility Study (FFS) for Water Management for the Disposal of CERCLA Waste on the Oak Ridge Reservation, Oak Ridge, Tennessee" prepared by DOE to address wastewater discharges—both contact water and landfill leachate—from both EMWMF, as well as from the Environmental Management Disposal Facility (EMDF), a new landfill DOE proposes to build to dispose of additional wastes generated by CERCLA cleanup actions at ORR.

40. In its 2016 letter, TDEC raised a number of concerns about the way wastewater discharges from EMWMF already were being mismanaged. For example, TDEC objected to the way contact water (a point source wastewater) from EMWMF was

being discharged into an unlined ditch, then improperly mixed and diluted with clean

stormwater in a sediment basin, prior to the point of compliance. TDEC viewed this

practice to be unauthorized by the CWA and found "no formal approval of the current

point of compliance in a primary CERCLA or FFA document." TDEC also noted the

presence of radionuclides in Bear Creek surface water, and found that DOE had failed to

establish discharge limits for them that would be protective of human health and the

environment.  The 2016 letter also pointed out that "Bear Creek and downstream surface

water are classified for recreation (e.g., fishing and fish consumption) and other uses and

impaired water quality in Bear Creek is not a new issue," and that "[t]his trend is

disturbing in light of the fact that DOE proposes to construct another disposal facility in

Bear Creek Valley. . . ."

41. In a separate letter to DOE a year later, TDEC raised additional concerns about

the EMWMF wastewater discharges into Bear Creek, noting that since 2009 there had

been a measurable increase in concentrations of mercury in downstream rock bass.

42. In 2016, EPA Region 4 also initiated an informal dispute pursuant to the FFA

over the same draft DOE FFS document, highlighting how the DOE approach to coming

up with effluent discharge limits for wastewater discharges into Bear Creek was

inconsistent with CERCLA and CWA requirements. When the issues between the

agencies could not be resolved, the Region initiated a formal dispute in August 2018.

43. TDEC and EPA originally initiated the dispute under the FFA in 2016 to

ensure that the effluent discharge limits for EMWMF—which had never been established

by a CWA permit or through the CERCLA remedy selection process leading up to the

1999 ROD—and EMDF would be protective of human health and the environment in

14

accordance with CERCLA and the NCP, the EPA regulation which codifies CERCLA's requirements and establishes the procedural and substantive federal "blueprint" for carrying out the CERCLA cleanup program.

44. The heart of the formal dispute initiated by TDEC and EPA originally centered on the development of Preliminary Remediation Goals (PRGs), a critical early step in the remedy selection process spelled out in the NCP.

45. TDEC repeatedly pointed out to DOE that ion exchange resin treatment technology "is the generally accepted approach for removing radiological constituents prior to discharge," that "DOE has and continues to use such wastewater treatment methods across the ORR," and that DOE had demonstrated that this treatment approach "is readily achievable with inexpensive, off-the-shelf technology."

46. In 2018, while the wastewater dispute was still pending, DOE published a proposed plan for the EMDF landfill and made it available to the public. The 2018 proposed plan stated:

> The Administrative Record for the management and discharge of this wastewater is not yet complete, and the evaluation of alternatives to address wastewater management in a D2 Focused Feasibility Study is currently under dispute between the Agencies. The ROD will describe CERCLA and NCP-compliant discharge requirements for wastewaters from the EMDF.

47. No proposed plan, supported by a contemporaneous final Focused Feasibility Study approved by EPA and TDEC, was published prior to the issuance of the EMDF ROD in September, 2022.

48. In a decision letter dated March 21, 2019, issued pursuant to the FFA's dispute resolution provisions (2019 RA Decision), the EPA Region 4 acting Regional Administrator determined that "waste waters discharged from the EMWMF and proposed

15

EMDF must meet the CERCLA §121(d) threshold requirement for ensuring

protectiveness of human health and the environment and that there is no exception for

discharges of radionuclides."

49. The 2019 RA Decision also determined that:

Such discharges as with any component of a CERCLA remedial action, must also comply with the other threshold requirement of attaining "applicable requirements" and/or "relevant and appropriate requirements" (ARARs) identified by EPA. In the event of a dispute among the FFA parties over remedy selection (which includes ARAR determinations), CERCLA §120(e)(4) is clear that EPA's authority is controlling at this NPL site.

50. The 2019 RA Decision found that determining PRGs for the effluent

discharges from the existing EMWMF landfill and the planned EMDF landfill triggered a

number of relevant and appropriate CWA requirements:

Under CWA §301, NPDES permits must contain effluent limitations based on the application of statutorily-prescribed levels of technology ("Technology-based effluent limits," or ["]TBELs"). Where technology-based effluent limitations are not sufficient to meet applicable state water quality standards, NPDES permits must include effluent limitations that ensure that water quality standards are met ("water quality-based effluent limits," or "WQBELs"). *In other words, technology-based effluent limits constitute a minimum floor of controls that must be included* in a permit, but they are supplemented by more stringent WQBELs whenever necessary to ensure compliance with water quality standards. The obligation that NPDES permits include effluent limitations as stringent as necessary to meet applicable water quality standards is not discretionary; it is inconsistent with the CWA for a permitting authority to issue a permit that does not ensure compliance with water quality standards. Additionally, TNWQS provide that in order to permit the reasonable and necessary uses of the waters of the State, *pollution should be prevented through application of the best available technology economically achievable or that greater level of technology necessary to meet water quality standards*. Furthermore, discharges from the ORR Site into surface waters *must be protective of designated uses as classified by Tennessee.* Bear Creek and its tributaries are designated for both "Fish and Aquatic Life" and "Recreation" uses. Where streams have multiple use designations, the most stringent water quality criteria will apply.

51. The 2019 RA decision also determined that "technologies (including ion exchange, activated carbon and/or reverse osmosis technology) … are available and achievable and have proven to be effective in controlling the discharge and meeting water quality criteria," and that "EPA believes that best available technology, including ion exchange, activated carbon and/or reverse osmosis technology, should be used to develop technology-based effluent limits for radionuclides and pollutant discharges into surface waters."

52. Because the definition of "pollutant" in EPA's CWA permitting regulations (40 C.F.R. §122.2) contains a limited carve-out for certain Atomic Energy Act-regulated radionuclides for a subset of EPA's CWA regulations, the 2019 RA Decision determined that such regulations are not "applicable" requirements; at the same time, however, the 2019 RA Decision correctly determined that for purposes of identifying CERCLA ARARs, even though requirements might not be "applicable," they still may be "relevant and appropriate (RAR)" if, as clearly stated in the NCP, the requirements "address problems or situations sufficiently similar to those encountered at the CERCLA site [so] that their use is well suited to the particular site."

The 2019 RA Decision correctly determined:

As explained in EPA's ARARs guidance '[a] requirement that is relevant and appropriate may "miss" on one or more jurisdictional prerequisites for applicability but still make sense at the site, given the circumstances of the site and release." *Jurisdictional prerequisites*, while key in the applicability determination, *are not the basis for relevance and appropriateness*.

The 2019 RA Decision also found that:

In assessing whether a requirement is relevant and appropriate, EPA evaluates the factors in paragraphs 40 CFR §300.400(g)(2)(i) through (viii) of the NCP to the extent such factors are pertinent. The pertinence of each of the factors depends, in part, on whether a requirement addresses a

17

chemical, location, or action. After careful consideration of the 40 CFR §300.400(g) factors, EPA Region 4 concludes that the CWA's NPDES technology-based and water quality-based effluent limitation regulations, and the TNWQS, as generally described below and as more specifically identified in the table enclosed herein (Enclosure), *are both relevant and appropriate to the discharge of radionuclides in waste water associated with these CERCLA actions because: (1) they address "point-source" discharges into surface water; (2) their purpose is to achieve the protection of surface waters; and (3) CERCLA also aims to address and prevent releases of hazardous substances, pollutants, and contaminants into the environment at unacceptable levels in order to ensure protection of human health and the environment.*

53. Thus, the 2019 RA Decision found five of the eight factors to be pertinent to the RAR evaluation, and as a result:

As stated above, based on an evaluation of the 40 CFR §300.400(g) factors, EPA Region 4 concludes that the CWA NPDES [national pollutant discharge elimination system] technology-based and water quality-based effluent limitation regulations and TNWQS [Tennessee water quality standards] are relevant and appropriate requirements to the discharge of radionuclide contaminated waste water at the ORR Site. Waste water discharges from the site should, therefore, comply with these requirements.

54. The 2019 RA Decision made several important findings related to statutory and regulatory provisions, as well as legislative history, pertaining to the purposes of various CWA requirements, including:

The CWA requires application of the "best available technology economically achievable" . . . which shall require the elimination of discharges of all pollutants if the Administrator finds, on the basis of information available to him . . . that such elimination is technologically and economically achievable . . ." 33 U.S.C. §1311(b)(2)(A).
                                        ***
*Here, existing treatment technology clearly is available and achievable under the CWA, and using that treatment technology is consistent with CERCLA section 121(b)'s preference for treatment "to the maximum extent practicable."* A non-treatment technology approach (e.g., reliance on dilution) as the methodology for deriving the effluent limitations ignores the technology-based provisions of the CWA and is inconsistent with the statutory preference for treatment under CERCLA §121(b)(l) and associated provisions in the NCP [national contingency plan].

55. The 2019 RA Decision also pointed out that "[t]he CWA Legislative History at 1425 (Senate Report) states: '(t)he use of any river, lake, stream or ocean as a waste treatment system is unacceptable' regardless of the measurable impact of the waste on the body of water in question," and that the CWA Conference Report states that the Act "specifically bans pollution dilution as an alternative to waste treatment." In public statements, DOE has admitted that it still intends to use dilution as part of its approach to the landfills' wastewater discharges.

56. As allowed by the FFA, DOE elevated the formal dispute to former EPA Administrator Andrew Wheeler on April 5, 2019. On the same day, and twice thereafter, TDEC wrote letters expressing its support for the March 21, 2019, RA Decision.

57. On December 31, 2020, former Administrator Wheeler issued his final decision (Wheeler Decision) resolving the yearslong dispute over how to determine effluent discharge limits for wastewater discharges at both EMWMF and EMDF. While the Wheeler Decision did reaffirm that CERCLA authority governs the cleanup at federal facility NPL sites like ORR, it did not uphold key aspects of the 2019 RA Decision. In particular, the Wheeler Decision decided that two CWA regulations – the most stringent ones requiring the use of best available technology to develop treatment based effluent limitations and the anti-degradation regulations – were not to be used in developing PRGs and subsequently in establishing effluent discharge limits from the existing and planned ORR landfills. In addition, the Wheeler Decision decided that long-standing, national EPA guidance did not need to be followed, despite express language to the contrary in the FFA and in Tennessee law.

58. On September 30, 2022, a CERCLA ROD for EMDF was signed by officials from DOE and TDEC, and by then-EPA Administrator Michael Regan; this is consistent with the NCP, which states at 40 CFR § 300.430(f)(4)(iii): "The process for selection of a remedial action at a federal facility on the NPL, pursuant to CERCLA section 120, shall entail: (A) Joint selection of remedial action by the head of the relevant department, agency, or instrumentality and EPA." The Wheeler Decision also explicitly recognizes that CERCLA remedies at NPL federal facility sites like ORR are selected pursuant to CERCLA § 120 authority.

59. The EMDF ROD makes numerous references to the fact that it is based on and follows the Wheeler Decision; by signing the EMDF ROD, former EPA Administrator Regan in effect reaffirmed the interpretations and determinations made by his predecessor.

60. Both the Wheeler Decision and the final, approved FFS for Water Management for the Disposal of CERCLA Waste on the Oak Ridge Reservation make it clear that PRGs and effluent discharge limits are to be calculated the same way for both the existing EMWMF and the to-be-built EMDF landfills.

61. The 1999 EMWMF ROD has not been updated, does not contain any effluent discharge limits for discharges of contact water containing mercury, PCBs and radionuclides into Bear Creek, and DOE has not obtained a CWA permit authorizing those discharges which have continued illegally for over twenty years.

The ORR FFA

62. The stated purpose of the 1992 FFA in Section III (Purposes of the Agreement) is to "[e]stablish a procedural framework and schedule for *developing, implementing* and

monitoring appropriate response actions at the Site *in accordance with CERCLA, the NCP*, RCRA [Resource Conservation and Recovery Act], NEPA [National Environmental Policy Act], appropriate *guidance and policy, and in accordance with Tennessee law."*

63. This provision is cross-referenced in several other provisions of the FFA. For example, the FFA in §§ XI, XII, XIV, XV, and XVI requires EPA and DOE to "meet the purposes set forth in Section III (Purposes of the Agreement)" when preparing specified remedy selection documents, including but not limited to remedial investigation and feasibility studies (RI/FS), proposed plans, and RODs.

64. Section III of the FFA also instructs the parties to "[i]mplement the selected operable unit(s) and final remedial action(s) *in accordance with CERCLA*" and includes a clear requirement that "[r]esponse actions at the Site *shall* attain that degree of remediation of hazardous substances, pollutants or contaminants *mandated by CERCLA*." (emphasis added).

65. These basic commitments made in the FFA by EPA, DOE and the State of Tennessee when they entered into their binding legal agreement in 1992 – to carry out the cleanup in accordance with CERCLA, the NCP, and EPA policy and guidance – similarly appear in the approximately 177 CERCLA § 120 FFAs governing the cleanup of other federal facilities listed on the NPL, and in hundreds of private party consent decrees entered into by the United States and potentially responsible parties at non-federal facility Superfund cleanup sites. This is consistent with CERCLA § 120(a)(1), which provides that:

> Each department, agency, and instrumentality of the United States (including the executive, legislative, and judicial branches of government) shall be subject to, and comply with, this chapter in the same manner and to the same extent, both

21

procedurally and substantively, as any nongovernmental entity, including liability under section 9607 of this title.

66. These basic commitments to act in accordance with CERCLA, the NCP and EPA policies and guidances help ensure that CERCLA cleanups achieve an equivalent minimum floor of protection of human health and the environment everywhere across the country.

67. CERCLA §121 contains several separate, independent requirements that must be met when selecting remedial actions. These requirements include a variety of mandatory and non-discretionary duties, such as attaining federal and more stringent state ARARs, ensuring protectiveness of human health and the environment, and using treatment to the maximum extent practicable.

68. EPA has interpreted these statutory requirements in the preamble to the final NCP, which clarifies the mandatory nature of CERCLA § 121's requirements. The 1990 preamble to the final NCP explains how the remedy selection process, including the development of PRGs, is designed "to ensure that remedies comply with *CERCLA's mandate* to be protective of human health and the environment and comply with ARARs." National Oil and Hazardous Substances Pollution Contingency Plan, 55 Fed. Reg. 8666, 8712 (Mar. 8, 1990).

69. The 1990 preamble, *id*. at 8720, also states: "The criterion [long-term effectiveness and permanence] is founded on *CERCLA's mandates* to select remedies that are protective of human health and the environment and that utilize permanent solutions and alternative treatment technologies or resource recovery technologies to the maximum extent practicable and that maintain protection over time."

22

70. The FFA commitment to carry out the ORR cleanup "in accordance with CERCLA" encompasses numerous statutory standards, regulations, conditions, and requirements (hereinafter "requirements").

71. "In accordance with CERCLA" includes the following requirements in CERCLA § 121(a):

> The President *shall select appropriate remedial actions* determined to be necessary to be carried out under section 9604 of this title or secured under section 9606 of this title which are *in accordance with this section and, to the extent practicable, the* national contingency plan, and which provide for cost-effective response.

72. "In accordance with CERCLA" includes the following requirements in CERCLA §121(b), "General Rules":

> *The President shall conduct an assessment of* permanent solutions and alternative *treatment technologies* or resource recovery technologies that, in whole or in part, will result in a permanent and significant decrease in the toxicity, mobility, or volume of the hazardous substance, pollutant, or contaminant. *In making such assessment,* the President *shall* specifically address the long-term effectiveness of *various alternatives.*
> *Remedial actions in which treatment which permanently and significantly reduces the volume, toxicity or mobility of the hazardous substances, pollutants, and contaminants is a principal element, are to be preferred over remedial actions not involving such treatment.*
>
> *The President shall select a remedial action that is protective of human health and the environment*, that is cost effective, *and that utilizes permanent solutions and alternative treatment technologies or resource recovery technologies to the maximum extent practicable.* If the President selects a remedial action not appropriate for a preference under this subsection, *the President shall publish an explanation as to why a remedial action involving such reductions was not selected.*

73. "In accordance with CERCLA" includes the following requirements in CERCLA § 121(d)(1):

> Remedial actions selected under this section or otherwise required or agreed to by the President under this chapter *shall attain* a degree of cleanup of hazardous substances, pollutants, and contaminants released

into the environment and *of control of further release at a minimum which assures protection of human health and the environment.*

74. "In accordance with CERCLA" includes the following requirements in

CERCLA § 121(d)(2):

A) With respect to any hazardous substance, pollutant or contaminant that will remain onsite, if—

(i) any standard, requirement, criteria, or limitation under any Federal environmental law, including, but not limited to … *the Clean Water Act* … or

(ii) any promulgated standard, requirement, criteria, or limitation under a State environmental or facility siting law *that is more stringent* than any Federal standard, requirement, criteria, or limitation, including each such State standard, requirement, criteria, or limitation contained in a program approved, authorized or delegated by the Administrator under a statute cited in subparagraph (A), and that has been identified to the President by the State in a timely manner, is legally applicable to the hazardous substance or pollutant or contaminant concerned or is relevant and appropriate under the circumstances of the release or threatened release of such hazardous substance or pollutant or contaminant, the remedial action selected under section 9604 of this title or secured under section 9606 of this title shall require, at the completion of the remedial action, a level or standard of control for such hazardous substance or pollutant or contaminant *which at least attains such legally applicable or relevant and appropriate standard, requirement, criteria, or limitation.*

75. "In accordance with CERCLA" includes the following requirements in

CERCLA § 121(c):

If the President selects a remedial action that results in any hazardous substances, pollutants, or contaminants remaining at the site, the President shall review such remedial action no less often than each 5 years after the initiation of such remedial action to assure that human health and the environment are being protected by the remedial action being implemented.

76. "In accordance with CERCLA" includes the following requirements in

CERCLA § 113(k)(2)(B):

The President shall provide for the participation of interested persons, including potentially responsible parties, in the development of the administrative record on which the President will base the selection of remedial actions and on which judicial review of remedial actions will be based. The procedures developed under this subparagraph shall include, at a minimum, each of the following:

(i) Notice to potentially affected persons and the public, which shall be accompanied by a brief analysis of the plan and alternative plans that were considered.

(ii) A reasonable opportunity to comment and provide information regarding the plan.

(iii) An opportunity for a public meeting in the affected area, in accordance with section 9617(a)(2) of this title (relating to public participation).

(iv) A response to each of the significant comments, criticisms, and new data submitted in written or oral presentations.

(v) A statement of the basis and purpose of the selected action.

77. "In accordance with CERCLA" includes the following requirements in

CERCLA § 117:

a) Proposed plan

Before adoption of any plan for remedial action to be undertaken by the President, by a State, or by any other person, under section 9604, 9606, 9620, or 9622 of this title, the President or State, as appropriate, *shall take both of the following actions*:

(1) *Publish a notice and brief analysis of the proposed plan and make such plan available to the public.*

(2) Provide a reasonable opportunity for submission of written and oral comments and an opportunity for a public meeting at or near the facility at issue regarding the proposed plan and regarding any proposed findings under section 9621(d)(4) of this title (relating to cleanup standards). The President or the State shall keep a transcript of the meeting and make such transcript available to the public.

*The notice and analysis published under paragraph (1) shall include sufficient information as may be necessary to provide a reasonable explanation of the proposed plan and alternative proposals considered.*

(b) Final plan

Notice of the final remedial action plan adopted shall be published and the plan shall be made available to the public before commencement of any remedial action. Such final plan shall be accompanied by a discussion of any significant changes (and the reasons for such changes) in the proposed plan and *a response to each of the significant comments, criticisms, and new data submitted in written or oral presentations under subsection (a) of this section.*

78. The National Contingency Plan is a regulation promulgated by EPA which

establishes the federal "blueprint" for carrying out CERCLA cleanup actions. The FFA

commitment to carry out the ORR cleanup "in accordance with the NCP" encompasses subpart E of the regulation, which includes a number of requirements for the CERCLA remedy selection process.

79. "In accordance with the NCP" includes 40 CFR § 300.400(g)(2), which directs:

> In evaluating relevance and appropriateness [for purposes of the ARARs requirements in CERCLA § 121(d)(2)], the factors in paragraphs (g)(2)(i) through (viii) of this section *shall be examined*, where pertinent, *to determine whether a requirement* addresses problems or situations sufficiently similar to the circumstances of the <u>release</u> or remedial action contemplated, and whether the requirement is <u>well</u>-suited to the site, and therefore *is both relevant and appropriate*.

80. "In accordance with the NCP" includes 40 C.F.R. §300.430(a)(1)(i) which sets the standard:

> The national goal of the remedy selection process is to select remedies that are *protective of human health and the environment*, that maintain protection over time, and that *minimize untreated waste*.

81. "In accordance with the NCP" includes 40 CFR § 300.430(a)(1)(iii) which provides:

> EPA generally *shall consider* the following expectations *in developing appropriate remedial alternatives:*
> a.   EPA expects to use *treatment* to address the principal threats posed by a site, *wherever practicable*. Principal threats for which treatment is most likely to be appropriate include liquids, areas contaminated with high concentrations of toxic compounds, and highly mobile materials…
> (C) EPA expects to use a combination of methods, as appropriate, to achieve protection of human health and the environment. In appropriate site situations, *treatment of the principal threats posed by a site, with priority placed on treating waste that is liquid, highly toxic or highly mobile,* will be combined with engineering controls (such as containment) and institutional controls, as appropriate, for treatment residuals and untreated waste…

82. "In accordance with the NCP" includes 40 CFR § 300.430(e)(2) which directs:

*Alternatives shall be developed* that protect human health and the environment by recycling waste or by eliminating, reducing, and/or controlling risks posed through each pathway by a site. The number and type of alternatives to be analyzed shall be determined at each site, taking into account the scope, characteristics, and complexity of the site problem that is being addressed. *In developing and, as appropriate, screening the alternatives, the lead agency shall:*

*(i) Establish remedial action objectives specifying contaminants and media of concern, potential exposure pathways, and remediation goals. Initially, preliminary remediation goals are developed based on readily available information, such as chemical-specific ARARs or other reliable information.* Preliminary remediation goals should be modified, as necessary, as more information becomes available during the RI/FS. *Final remediation goals will be determined when the remedy is selected. Remediation goals shall establish acceptable exposure levels that are protective of human health and the environment and shall be developed by considering the following:*

*(A) Applicable or relevant and appropriate requirements under federal environmental or state environmental or facility siting laws, if available, and the following factors:*

(*1*) For systemic toxicants, acceptable exposure levels shall represent concentration levels to which the human population, including sensitive subgroups, may be exposed without adverse effect during a lifetime or part of a lifetime, incorporating an adequate margin of safety;

(*2*) For known or suspected carcinogens, acceptable exposure levels are generally concentration levels that represent an excess upper bound lifetime cancer risk to an individual of between $10^{-4}$ *and* $10^{-6}$ using information on the relationship between dose and response. The $10^{-6}$ *risk level shall be used as the point of departure for determining remediation goals for alternatives when ARARs are not available or are not sufficiently protective because of the presence of multiple contaminants at a site or multiple pathways of exposure;*

83. "In accordance with the NCP" includes 40 CFR § 300.430(e)(9)(i) which

requires "*Detailed analysis of alternatives*":

*A detailed analysis shall be conducted on the limited number of alternatives that represent viable approaches to remedial action after evaluation in the screening stage. The lead and support agencies must identify their ARARs related to specific actions in a timely manner and no later than the early stages of the comparative analysis.* The lead and support agencies may also, as appropriate, identify other pertinent advisories, criteria, or guidance in a timely manner.

84. "In accordance with the NCP" includes 40 CFR 40 CFR § 300.430(e)(9)(iii)

(A) which mandates:

(A) Overall protection of human health and the environment. *Alternatives shall be assessed to determine whether they can adequately protect human health and the environment, in both the short- and long-term, from unacceptable risks posed by hazardous substances, pollutants, or contaminants present at the site by eliminating, reducing, or controlling exposures to levels established during development of remediation goals consistent with* § 300.430(e)(2)(i). Overall protection of human health and the environment draws on the assessments of other evaluation criteria, especially long-term effectiveness and permanence, short-term effectiveness, and compliance with ARARs.

(B) Compliance with ARARs. *The alternatives shall be assessed* to determine whether they attain applicable or relevant and appropriate requirements under federal environmental laws and state environmental or facility siting laws or provide grounds for invoking one of the waivers under paragraph (f)(1)(ii)(C) of this section…

(D) *Reduction of toxicity, mobility, or volume through treatment.* The degree to which alternatives employ recycling or treatment that reduces toxicity, mobility, or volume *shall be assessed*, including how treatment is used to address the principal threats posed by the site.

85. "In accordance with the NCP" includes 40 CFR § 300.430(f)(1) which

requires:

> (1) *Remedies selected shall* reflect the scope and purpose of the actions being undertaken and how the action relates to long-term, comprehensive response at the site.
> (i) The criteria noted in paragraph (e)(9)(iii) of this section *are used to select a remedy*. These criteria are categorized into three groups.
> (A) *Threshold criteria.* Overall protection of human health and the environment and compliance with ARARs (unless a specific ARAR is waived) *are threshold requirements that each alternative must meet in order to be eligible for selection.*

86. "In accordance with the NCP" includes 40 CFR § 300.430(f)(1) which

requires:

> (ii) The selection of a remedial action is a two-step process and shall proceed in accordance with § 300.515(e). *First, the lead agency, in conjunction with the support agency, identifies a preferred alternative and presents it to the public in a proposed plan, for review and comment.* Second, the lead agency shall review the public comments and consult with the state (or support agency) in order to determine if the alternative remains the most appropriate remedial action for the site or site problem. The lead agency, as specified in § 300.515(e), *makes the final remedy selection decision, which shall be documented in the ROD.* Each remedial

alternative selected as a Superfund remedy will employ the criteria as indicated in paragraph (f)(1)(i) of this section to make the following determination:

*(A) Each remedial action selected shall be protective of human health and the environment.*

*(B) On-site remedial actions selected in a ROD must attain those ARARs that are identified at the time of ROD signature or provide grounds for invoking a waiver under § 300.430(f)(1)(ii)(C).*

*\*\*\**

*(E) Each remedial action shall utilize permanent solutions and alternative treatment technologies or resource recovery technologies to the maximum extent practicable.*

87. "In accordance with the NCP" includes 40 CFR § 300.430(f)(2) which

requires:

(2) *The proposed plan. In the first step in the remedy selection process, the lead agency shall identify the alternative that best meets the requirements in § 300.430(f)(1), above, and shall present that alternative to the public in a proposed plan. The lead agency, in conjunction with the support agency and consistent with § 300.515(e), shall prepare a proposed plan that briefly describes the remedial alternatives analyzed by the lead agency, proposes a preferred remedial action alternative, and summarizes the information relied upon to select the preferred alternative.* The selection of remedy process for an operable unit may be initiated at any time during the remedial action process. *The purpose of the proposed plan is to supplement the RI/FS and provide the public with a reasonable opportunity to comment on the preferred alternative for remedial action,* as well as alternative plans under consideration, and to participate in the selection of remedial action at a site. *At a minimum, the proposed plan shall:*

(i) *Provide a brief summary description of the remedial alternatives evaluated in the detailed analysis established under paragraph (e)(9) of this section;*

*(ii) Identify and provide a discussion of the rationale that supports the preferred alternative;*

(iii) Provide a summary of any formal comments received from the support agency;

(iv) Provide a summary explanation of any proposed waiver identified under paragraph (f)(1)(ii)(C) of this section from an ARAR.

88. "In accordance with the NCP" includes 40 CFR § 300.430(f)(3) which requires:

(3) *Community relations to support the selection of remedy.*

(i) The lead agency, after preparation of the proposed plan and review by the support agency, *shall conduct the following activities:*

(A) Publish a notice of availability and brief analysis of the proposed plan in a major local newspaper of general circulation;

(B) Make the proposed plan and supporting analysis and information available in the administrative record *required* under subpart I of this part;

(C) *Provide a reasonable opportunity*, not less than 30 calendar days, for submission of *written and oral comments on the proposed plan and the supporting analysis and information located in the information repository, including the RI/FS.* Upon timely request, the lead agency will extend the public comment period by a minimum of 30 additional days;

(D) Provide the opportunity for a public meeting to be held during the public comment period at or near the site at issue regarding the proposed plan and the supporting analysis and information;

(E) Keep a transcript of the public meeting held during the public comment period pursuant to CERCLA section 117(a) and make such transcript available to the public; and

(F) Prepare a written summary of significant comments, criticisms, and new relevant information submitted during the public comment period and the lead agency response to each issue. This responsiveness summary shall be made available with the record of decision.

89. "In accordance with the NCP" includes 40 CFR § 300.430(f)(5) which

mandates:

(5) *Documenting the decision.*

(ii) The *ROD shall describe* the following statutory requirements as they relate to the scope and objectives of the action:

(A) *How the selected remedy is protective of human health and the environment, explaining how the remedy eliminates, reduces, or controls exposures to human and environmental receptors;*

(B) *The federal and state requirements that are applicable or relevant and appropriate to the site that the remedy will attain;*

(C) The applicable or relevant and appropriate requirements of other federal and state laws that the remedy will not meet, the waiver invoked, and the justification for invoking the waiver;

(D) How the remedy is cost-effective, *i.e.*, explaining how the remedy provides overall effectiveness proportional to its costs;

(E) How the remedy utilizes permanent solutions and alternative treatment technologies or resource recovery technologies to the maximum extent practicable; and

(F) *Whether the preference for remedies employing treatment which permanently and significantly reduces the toxicity, mobility, or volume of the hazardous substances, pollutants, or contaminants as a principal element is or is not satisfied by the selected remedy. If this preference is not satisfied, the record of decision must explain why a remedial action involving such reductions in toxicity, mobility, or volume was not selected.*

90. To help administer the CERCLA cleanup program in a consistent and transparent manner in order to help provide a minimum floor of protection for all cleanups across the country, EPA has issued numerous policy statements and guidance documents, many of which address issues within the purview of EPA's technical expertise.  Many of these policy statements are published in the preamble to the final NCP interpreting CERCLA and the provisions in the final NCP, including the following policy statements.

91. "In accordance with" the preamble to the final NCP, 55 Fed. Reg. 8666, 8712 (Mar. 8, 1990), the CERCLA remedy selection process, including the development of preliminary remediation goals (PRGs), is designed "to ensure that remedies comply *with CERCLA's mandate to be protective of human health and the environment and comply with ARARs*."

92. "In accordance with" the preamble to the final NCP, 55 Fed. Reg. 8666, 8720: "The criterion [long-term effectiveness and permanence] is founded on *CERCLA's mandates to select remedies that are protective of human health and the environment and that utilize permanent solutions and alternative treatment technologies or resource recovery technologies to the maximum extent practicable* and that maintain protection over time."

93. "In accordance with" the preamble to the final NCP, 55 Fed. Reg. 8666, 8720: "*The overall assessment of protection draws on* the assessments conducted under other evaluation criteria, especially long-term effectiveness and permanence, short-term effectiveness, and *compliance with ARARs*."

94. "In accordance with" the preamble to the final NCP, 55 Fed. Reg. 8666, 8709:

Further, EPA notes that *CERCLA requires that all Superfund remedies be protective of human health and the environment* but provides no guidance on how this determination is to be made other than to *require the use of ARARs as remediation goals where these ARARs are related to protectiveness*.

95. "In accordance with" the preamble to the final NCP, 55 Fed. Reg. 8666, 8741: "*CERCLA requires* that remedial actions comply with all requirements that are applicable or relevant and appropriate. *Therefore, a remedial action has to comply with the most stringent requirement that is ARAR to ensure that all ARARs are attained*."

96. "In accordance with" the preamble to the final NCP, 55 Fed. Reg. 8666, 8703: "However, *consistent with CERCLA, treatment remains the preferred method of attaining protectiveness, wherever practicable*."

97. "In accordance with" the preamble to the final NCP, 55 Fed. Reg. 8666, 8743: "Jurisdictional prerequisites, while key in the applicability determination, *are not the basis* for relevance and appropriateness. Rather, the evaluation focuses on the purpose of the requirement, the physical characteristics of the site and the waste, and other environmentally- or technically-related factors."

98. "In accordance with" the preamble to the final NCP, 55 Fed. Reg. 8666, 8744, EPA policy is clear that with regard to the eight factors for evaluating RARs in 40 CFR 300.400(g)(2), any potential exemptions are those related to "specific circumstances where compliance with a requirement may be inappropriate for technical reasons or unnecessary to protect human health and the environment."

99. "In accordance with" the preamble to the final NCP, 55 Fed. Reg. 8666, 8746:

EPA believes, however, that general goals, such as non-degradation laws, can be potential ARARs if they are promulgated, and therefore legally enforceable, and if they are directive in intent.

*** 

For example, in the preamble to the proposed NCP, EPA cited the example of a state anti-degradation statute that prohibits the degradation of surface water below a level of quality necessary to protect certain uses of the water body (53 FR 51438). If promulgated, such a requirement is clearly directive in nature and intent. State regulations that designate uses of a given water body and state water quality standards that establish maximum in-stream concentrations to protect those uses define how the antidegradation law will be implemented are, if promulgated, also potential ARARs.

100. "In accordance with" the preamble to the final NCP, 55 Fed. Reg. 8666, 8716: "EPA's preference, all things being equal, is to select remedies that are at the more protective end of the risk range. Therefore, when developing its preliminary remediation goals, *EPA uses 10-6 as a point of departure* (see next preamble section on point of departure)."

101. "In accordance with" the preamble to the final NCP, 55 Fed. Reg. 8666, 8701 EPA further maintains:

Additionally, it is now clear that ARARs do not by themselves necessarily define protectiveness. First, ARARs do not exist for every contaminant, location, or waste management activity that may be encountered or undertaken at a CERCLA site. Second, in those circumstances where multiple contaminants are present, the cumulative risks posed by the potential additivity of the constituents may require cleanup levels for individual contaminants to be more stringent than ARARs to ensure protection at the site. Finally, determining whether a remedy is protective of human health and the environment also requires consideration of the acceptability of any short-term or cross-media impacts that may be posed during implementation of a remedial action.

102. "In accordance with" the preamble to the final NCP, 55 Fed. Reg. 8666, 8713, the EPA says:

Where ARARs do not exist or where the baseline risk assessment indicates that cumulative risks—due to additive or synergistic effects from multiple

33

contaminants or multiple exposure pathways—make ARARs
nonprotective, EPA will modify preliminary remediation goals, as
appropriate, to be protective of human health and the environment."

103. "In accordance with" the preamble to the final NCP, 55 Fed. Reg.

8666, 8726, this means:

In some situations, compliance with ARARs may not result in protective
remedies because of exposure to multiple chemicals or through multiple
exposure pathways that have additive or synergistic effects. In this case a
remedy may need to achieve levels more stringent than the ARARs to
ensure protection."

104. "In accordance with" the preamble to the proposed NCP, 53 Fed. Reg. 51394,

51443 substantive requirements may be expressed other than in a permit:

The purpose of this [CERCLA section 121(e)(1)] exemption is to allow
CERCLA response actions to proceed expeditiously without the delays
that could result while waiting for other offices or agencies to issue a
permit. *The substantive requirements that would be imposed by a permit
still must be stated in Superfund documents*, but the redundancy of stating
such standards in a permit issued by another office or agency is avoided.

105. "In accordance with" the preamble to the final NCP, 55 Fed. Reg. 8666,

8756:

These subsections reflect Congress' judgment that *CERCLA actions
should not be delayed by* time-consuming and *duplicative* administrative
requirements such as permitting, although the remedies should achieve the
substantive standards of applicable or relevant and appropriate laws.
Indeed, CERCLA has its own comparable procedures for remedy selection
and state and community involvement. . . . Accordingly, it would be
inappropriate to formally subject CERCLA response actions to the
multitude of administrative requirements of other federal and state offices
and agencies.

106. EPA also has published numerous long-standing, national CERCLA guidance

documents, including the following.

107. "In accordance with" *Clarification of the Role of Applicable or Relevant and Appropriate Requirements in Establishing Preliminary Remediation Goals Under CERCLA*:

> These [other] federal environmental and public health laws were enacted with the goal of protecting public health and the environment. Regulations developed under these laws have imposed requirements that EPA and other Federal agencies deemed necessary to protect public health and the environment. Because protection of public health and the environment is also the goal of CERCLA's response actions, other Federal environmental and public health laws will normally provide a baseline or floor for CERCLA responses. National Oil and Hazardous Substances Pollution Contingency Plan, 50 Fed. Reg. 47912, 47917 (Nov. 20, 1985).

108. "In accordance with" the *Compliance with Other Laws Manual*, this EPA guidance includes an entire chapter devoted to "Guidance for Compliance with Clean Water Act Requirements."

109. The guidance (at p. 3-3) highlights the fact that the CWA's objective "is achieved through the control of discharges of pollutants to navigable waters." The guidance (at p. 3-4) states that the use of best available technology (BAT) "is the major national method of controlling the direct discharge of toxic and non-conventional pollutants to waters of the U.S."

110. "In accordance with" *CERCLA COMPLIANCE WITH THE CWA AND SDWA*, p. 2:

> Technology-Based Limitations • CWA section 301(b) requires that, at a minimum, all direct discharges meet technology-based limits. Technology-based requirements for conventional pollutant discharges include application of the best conventional pollutant control technology (BCT). For toxic and nonconventional pollutants, technology-based requirements include the best available technology economically achievable (BAT).

111. "In accordance with" the *NPDES PERMIT WRITERS' MANUAL*, p. 5-1:

Technology-based effluent limitations (TBELs) aim to prevent pollution by requiring a minimum level of effluent quality that is attainable using demonstrated technologies for reducing discharges of pollutants or pollution into the waters of the United States. . . . The NPDES regulations at Title 40 of the Code of Federal Regulations (CFR) 125.3(a) require NPDES permit writers to develop technology-based treatment requirements, consistent with CWA section 301(b), that represent the minimum level of control that must be imposed in a permit. The regulation also indicates that permit writers must include in permits additional or more stringent effluent limitations and conditions, including those necessary to protect water quality.

112. "In accordance with" *NPDES PERMIT WRITERS' MANUAL*, at p. 6-1:

WQBELs are designed to protect water quality by ensuring that water quality standards are met in the receiving water. On the basis of the requirements of Title 40 of the Code of Federal Regulations (CFR) 125.3(a), additional or more stringent effluent limitations and conditions, such as WQBELs, are imposed when TBELs are not sufficient to protect water quality.

113. "In accordance with" *Permit Limits—TBELs and WQBELs*, "[i]f TBELs are not sufficient to meet the water quality standards in the receiving water, the CWA (§303(b)(1)(c)) and NPDES regulations (40 CFR 122.44(d)) require that the permit writer develop more stringent, water quality-based effluent limits (WQBELs)."

114. "In accordance with" *Key Concepts Module 4: Antidegradation*: "Under the Clean Water Act (CWA), once the existing uses of a water body have been established—by evaluating the water's quality relative to uses already attained—a State/Tribe must maintain the level of water quality that has been identified as being necessary to support those existing uses;" and, "Before permitting degradation for point sources, the State/Tribe must ensure that the most stringent technology-based controls required by statute and regulation will be implemented."

115. "In accordance with" *COMPLIANCE WITH OTHER LAWS MANUAL* at p. 3-14. "The objectives of the antidegradation policy are to: Protect existing uses of waters."

116. "In accordance with" *HUMAN HEALTH AMBIENT WATER QUALITY CRITERIA AND FISH CONSUMPTION RATES: FREQUENTLY ASKED QUESTIONS*: "It is also important to avoid any suppression effect that may occur when a fish consumption rate for a given subpopulation reflects an artificially diminished level of consumption for that subpopulation because of a perception that fish are contaminated with pollutants."

117. "In accordance with" *GUIDANCE FOR CONDUCTING FISH AND WILDLIFE CONSUMPTION SURVEYS*: "Environmental standards utilizing suppressed rates may contribute to a scenario in which future aquatic environments will support no better than suppressed rates."

118. "In accordance with" *Guidance for Conducting Remedial Investigations and Feasibility Studies Under CERCLA RI/FS*:

**1.1 Purpose of the RI/FS**
The remedial investigation and feasibility study (RI/FS) process as outlined in this guidance represents *the methodology that the Superfund program has established for characterizing the nature and extent of risks posed by uncontrolled hazardous waste sites* and for evaluating potential remedial options.

119. "In accordance with" *Guidance for Conducting Remedial Investigations and Feasibility Studies Under CERCLA RI/FS*:

**1.4 The RI/FS Process Under CERCLA**
Although the new provisions of CERCLA have resulted in some modifications to the RI/FS process, the basic components of the process remain intact. *The RI continues to serve as the mechanism for collecting data to characterize site conditions;* determine the nature of the waste; *assess risk to human health and the environment;* and conduct treatability testing as necessary to evaluate the potential performance and cost of the treatment technologies that are being considered. The latter also supports the design of selected remedies. The FS continues to serve as the mechanism for the development, screening, and detailed evaluation of alternative remedial actions.

*The various steps, or phases, of the RI/FS process and how they have been modified to comply with the new provisions in CERCLA* are summarized below.

120. "In accordance with" GUIDANCE FOR CONDUCTING REMEDIAL INVESTIGATIONS AND FEASIBILITY STUDIES UNDER CERCLA RI/FS:

### *3.2.4 Determine the Nature and Extent of Contamination*

The final objective of the field investigations is to *characterize the nature and extent of contamination such that informed decisions can be made as to the level of risk* presented by the site and the appropriate type(s) of remedial response.

121. "In accordance with" GUIDANCE FOR CONDUCTING REMEDIAL INVESTIGATIONS AND FEASIBILITY STUDIES UNDER CERCLA RI/FS:

### 3.4 Data Analyses

Analyses of the data collected should focus on the development or refinement of the conceptual site model *by presenting and analyzing data on source characteristics*, *the nature and extent of contamination*, the contaminated transport pathways and fate, and the *effects on human health and the environment*…

### 3.4.1.3 The Nature and Extent of Contamination

An analysis of data collected concerning the study area should be performed to describe contaminant concentration levels found in environmental media in the study area. Analyses that are important to the subsequent risk assessment and subsequent development of remedial alternatives include *the horizontal and vertical extent of contamination in soil*, ground water, surface water, sediment, air, biota, and facilities.[5] Spatial and temporal trends in contamination may be important in evaluating transport pathways. Data should be arranged in tabular or graphical form for clarity. Figure 3-2 shows an example of *how the extent of soil and ground-water contamination can be represented in terms of excess lifetime cancer risk.* Similar figures can be prepared showing concentrations rather than risk values.

122. "In accordance with" GUIDANCE FOR CONDUCTING REMEDIAL INVESTIGATIONS AND FEASIBILITY STUDIES UNDER CERCLA RI/FS:

### *3.4.2 Baseline Risk Assessment*

### 3.4.2.1 General Information

*Baseline risk assessments provide an evaluation of the potential threat to human health and the environment in the absence of any remedial action…*

In general, the objectives of a baseline risk assessment may be attained by identi-
fying and characterizing the following:

*Toxicity and levels of hazardous substances present in* relevant media (e.g., air,
ground water, *soil,* surface water, sediment, and biota)…

123. "In accordance with" *GUIDANCE FOR CONDUCTING REMEDIAL INVESTIGATIONS AND FEASIBILITY STUDIES UNDER CERCLA RI/FS*, at p. 6-8: "This evaluation criterion addresses the statutory preference for selecting remedial actions that employ treatment technologies that permanently and significantly reduce toxicity, mobility, or volume of the hazardous substances as their principal element."

124. "In accordance with" *Risk Assessment Guidance for Superfund (RAGS),* Part A provides detailed guidance for carrying out a CERCLA baseline risk assessment, Part B provides detailed guidance for development of risk-based preliminary remediation goals, and Part C provides detailed guidance for carrying out human health risk evaluations of remedial alternatives that are conducted during the feasibility study, during selection and documentation of a remedy.

125. "In accordance with" *Establishment of Cleanup Levels for CERCLA Sites with Radioactive Contamination*:

"Since all radionuclides are carcinogens, this guidance addresses carcinogenic risk;"

"This guidance clarifies that cleanups of radionuclides are governed by the risk range for all carcinogens established in the NCP when ARARs are not available or are not sufficiently protective;"

"Cleanup levels for radioactive contamination at CERCLA sites should be established as they would for any chemical that poses an unacceptable risk and the risks should be characterized in standard Agency risk language consistent with CERCLA guidance."

126. "In accordance with" *Preliminary Remediation Goals for Radionuclides*, EPA policy is that the risks to human health and the environment from radionuclides are comparable to the risks to human health and the environment from other hazardous substances (e.g., chemicals, metals, etc.), and should be addressed in a consistent manner (e.g., use of NCP's risk range for carcinogens).

127. "In accordance with" *A GUIDE TO PREPARING SUPERFUND PROPOSED PLANS, RECORDS OF DECISION, AND OTHER REMEDY SELECTION DECISION DOCUMENTS*, p. 1-5: "The Proposed Plan, as well as the RI/FS and the other information that forms the basis for the lead agency's response selection, is made available for public comment in the Administrative Record file," and at 3-4, [a proposed plan] "should clearly describe why the lead agency is recommending the Preferred Alternative."

"In accordance with" *Guidance for Conducting RI/FS*, at p.1-5:

Section 117 of CERCLA (Public Participation) emphasizes the importance of early, constant, and responsive relations with communities affected by Superfund sites and codifies, with some modifications, current community relations activities applied at NPL sites. Specifically, *the law requires* publication of a notice of any proposed remedial action (proposed plan) in a local newspaper of general circulation and *a "reasonable opportunity" for the public to comment on the proposed plan and other contents of the administrative record, particularly the RI and the FS. I*n addition, the public is to be afforded an opportunity for a public meeting. The proposed plan should include a brief explanation of the alternatives considered, which will usually be in the form of a summary of the FS.

128. "In accordance with" *Guidance for Conducting RI/FS*, at 6-14: "Following completion of the RI/FS, the results of the detailed analyses, when combined with the risk management judgments made by the decisionmaker, become the rationale for selecting a preferred alternative and preparing the proposed plan."

129. "In accordance with" GUIDE TO PREPARING REMEDY SELECTION DECISION

DOCUMENTS, at p. 6-57:

> "At the same time, the summary will be a critical document in the defense of the lead agency's actions. For this reason, the summary should fully and completely express the lead agency's policy, technical, and legal rationales."

130. "In accordance with" the *Comprehensive Five-Year Review Guidance*:

The purpose of a five-year review is to evaluate the implementation and performance of a remedy in order to determine if the remedy is or will be protective of human health and the environment. Protectiveness is generally defined in the National Contingency Plan (NCP) by the risk range and the hazard index (HI). Evaluation of the remedy and the determination of protectiveness should be based on and sufficiently supported by data and observations.

131. "In accordance with" the *Comprehensive Five-Year Review Guidance*:

Your technical assessment of a remedy should examine the following three questions, which provide a framework for organizing and evaluating data and information and ensure that all relevant issues are considered when determining the protectiveness of the remedy: •

- Question A - Is the remedy functioning as intended by the decision documents?
- Question B - *Are the exposure assumptions, toxicity data, cleanup levels, and remedial action objectives (RAOs) used at the time of the remedy selection still valid?*
- Question C - *Has any other information come to light that could call into question the protectiveness of the remedy?*

132. "In accordance with" the *Comprehensive Five-Year Review Guidance*:

You should consider any other information that comes to light that could call into question the protectiveness of the remedy. It is expected that most considerations related to the protectiveness of the remedy will be covered by Questions A and B. However, in some instances, there may be other factors about the remedy or the site that you should consider during the review.

133. "In accordance with" the *Comprehensive Five-Year Review Guidance*:

After addressing Questions A, B, and C, you should be ready to determine the protectiveness of the remedy or remedies at a site *and to document the rationale for your determination(s).* You should make a protectiveness statement for each OU and an additional, comprehensive site-wide protectiveness statement for those

sites that have reached construction completion. Your determination of whether the remedy remains protective of human health and the environment generally should be based on the answers to Questions A, B, and C and the information obtained in the process of answering them. *Although protectiveness generally is defined by the risk range and hazard index (HI), your answers to Questions A, B, and C may identify other factors and issues that may impact the protectiveness of a remedy*.

134. "In accordance with" METHODOLOGY FOR DERIVING AMBIENT WATER QUALITY CRITERIA FOR THE PROTECTION OF HUMAN HEALTH, at 1-10:

AWQC [ambient water quality criteria] for the protection of human health are designed to minimize the risk of adverse effects occurring to humans from chronic (lifetime) exposure to substances through the ingestion of drinking water and consumption of fish obtained from surface waters. . . . Although the AWQC are based on chronic health effects data (both cancer and noncancer effects), the criteria are intended to also be protective against adverse effects that may reasonably be expected to occur as a result of elevated acute or short-term exposures. That is, through the use of conservative assumptions with respect to both toxicity and exposure parameters, *the resulting AWQC should provide adequate protection not only for the general population over a lifetime of exposure*, but also for special subpopulations who, because of high water- or fish-intake rates, or because of biological sensitivities, have an increased risk of receiving a dose that would elicit adverse effects. The Agency recognizes that there may be some cases where the AWQC based on chronic toxicity may not provide adequate protection for a subpopulation at special risk from shorter-term exposures. The Agency encourages States, Tribes, and others employing the 2000 Human Health Methodology to give consideration to such circumstances in deriving criteria *to ensure that adequate protection is afforded to all identifiable subpopulations.*

135. "In accordance with" HUMAN HEALTH AMBIENT WATER QUALITY CRITERIA AND FISH CONSUMPTION RATES, the use of a 70-year lifetime exposure assumption is explained further:

This approach is consistent with a principle that *every State does its share to protect people who consume fish and shellfish that originate from multiple jurisdictions*. In addition, the goal of water quality criteria for human health is to *protect people from exposure to pollutants through fish and water over a lifetime*, and the *goal of a State's designated use should be that the waters are safe to fish in the context of the total consumption pattern of its residents.* Likewise, because people are expected to continue consuming fish and shellfish *throughout their lifetime regardless of where they live,* and this

42

consumption leads to similar exposure to pollutants, it is appropriate to derive protective human health criteria in State and Tribal water quality standards *assuming a lifetime of exposure*.

136. The purpose of using a lifetime exposure of 70 years is also explained in *GUIDANCE IN THE EXPOSURE FACTORS HANDBOOK*, ch. 18.

137. "In accordance with" the 2014 *ESTIMATED FISH CONSUMPTION RATES FOR THE U.S. POPULATION AND SELECTED SUBPOPULATIONS*, EPA updated its national default fish consumption rate (FCR) guidance from 17.5 g/day to *22 g/day*. This FCR represents the 90th percentile consumption rate of fish and shellfish from inland and nearshore waters for the U.S. adult population 21 years of age and older, based on National Health and Nutrition Examination Survey data from 2003 to 2010. *FINAL REPORT* (2014) (EPA-820-R-14-002). In that same 2014 FCR guidance update, EPA set the inland south FCR—*which includes the State of Tennessee—at 22.8 g/day*. Finally, the current FCR default values in EPA's *PRG Calculator for Radionuclides* —the CERCLA guidance that the EMDF ROD says is being used as the basis for its calculations—are even higher.

138. To help states like Tennessee implement CWA statutory and regulatory requirements, EPA has published a number of national guidance documents. Tennessee's CWA regulations (i.e., TDEC Rule 0400-40-03-.02(10)) specifically require that "[i]nterpretation and application of narrative criteria *shall be based on* available scientific literature and *EPA guidance and regulations*." The narrative criteria "for the use of Recreation" covered by this requirement appear subsequently in the same regulation. Nonetheless, EPA and DOE have ignored and contradicted current EPA guidance.

Violations Of CERCLA and the NCP

139. Numerous actions taken by EPA and DOE as part of the implementation of CERCLA response actions at ORR, including the Wheeler Decision, the RI/FS, the FFS, and the EMDF ROD, violate requirements and non-discretionary duties in CERCLA and the NCP, violate the provisions of the FFA, and deviate materially from numerous long-standing national EPA guidance documents without providing any reasoned explanations and scientifically credible supporting data for such deviations.

140. The violations include failure to attain all identified and available ARARs, failure to use treatment technologies to the maximum extent practicable, failure to ensure protectiveness of human health and the environment, and failure to follow the CERCLA and NCP remedy selection process.

Failure to Attain TBEL and Anti-Degradation ARARs in the EMDF ROD

141. Contrary to, and in violation of, the requirements in CERCLA § 121(a), EPA and DOE failed to select "appropriate remedial actions… which are in accordance with this section" in the EMDF ROD.

142. Contrary to, and in violation of, the requirements in CERCLA §121(d), EPA and DOE failed to incorporate protective CWA TBELs in the CERCLA and NCP remedy selection process for the EMDF ROD and instead improperly used federal and state water quality standards regulations to develop *less* stringent and not protective values for use in calculating effluent discharge limits for discharges from the EMDF landfill into Bear Creek and its downstream waters. As a result, the remedial actions selected by EPA and DOE for the EMDF ROD do not attain all available ARARs and do not "attain a degree of cleanup of hazardous substances, pollutants, and contaminants released into

the environment and of control of further release at a minimum which assures protection

of human health and the environment."

143. Contrary to, and in violation of, the requirements in CERCLA §121(d)(2),

EPA and DOE failed to select a remedial action in the EMDF ROD which attains all

readily available and identified federal, and more stringent state, Clean Water Act

ARARs.

144. In the EMDF ROD, EPA and DOE arbitrarily and capriciously excluded the

most stringent available CWA regulations governing development of TBELs and anti-

degradation from the CERCLA remedy selection process, even though those CWA

regulations are available, are sufficiently protective, and are well-suited to the

development of remedial action objectives, PRGs and remediation goals related to

establishing effluent discharge limits for discharges from the EMWMF and EMDF

landfills into Bear Creek and its downstream waters.  EPA and DOE did not attain CWA

WQBEL ARARs because the agencies arbitrarily and capriciously developed

unprotective PRGs for WQBELs related to effluent discharges from the landfills which

result in a cumulative risk in excess 1 x 10-4, outside the NCP's established excess cancer

risk range which determines acceptable risk – and protectiveness of human health -- for

purposes of CERCLA response actions.

145. Contrary to, and in violation of, the requirements in CERCLA § 121(a), EPA

and DOE failed to select "appropriate remedial actions… which are in accordance with

… the national contingency plan" in the EMDF ROD.

146. Contrary to, and in violation of, the NCP requirements in 40 CFR §

300.400(g)(2), EPA and DOE failed to incorporate the CWA TBEL regulations in the

CERCLA remedy selection process for the EMDF landfill. EPA and DOE arbitrarily and capriciously did not examine all the pertinent factors in 40 CFR § 300.400(g)(2) and their unreasonable and unpersuasive "examination" of the three factors they did address ignore and contradict clear language in CERCLA, the CWA, the NCP and EPA policy and guidance.

147. EPA and DOE did not examine factor (ii), which is "the *medium regulated or affected* by the requirement and the medium contaminated or affected at the CERCLA site." The CWA regulates effluent discharges from point sources (like landfills) *into waters of the United States*. Effluent discharges from the EMWMF landfill currently go into Bear Creek and effluent discharges would continue to go into Bear Creek once the EMDF landfill is built. For purposes of determining whether CWA regulations are well-suited for use as ARARs for the remedies selected for the EMWMF and EMDF landfills, *Bear Creek clearly is a "medium regulated or affected"* by the CWA TBEL regulations.

148. EPA and DOE did not examine factor (iv), which is "the *actions or activities regulated* by the requirement and the remedial action contemplated at the CERCLA site." Again, the CWA regulates effluent *discharges from point sources (like landfills)* into waters of the United States. Effluent *discharges from the EMWMF landfill* currently go into Bear Creek and *effluent discharges* would continue to go into Bear Creek once the EMDF landfill is built. For purposes of determining whether CWA regulations are well-suited for use as ARARs for the remedies selected for the EMWMF and EMDF landfills, *discharging effluent from EMWMF and EMDF landfills i*nto Bear Creek clearly is an action or activity addressed by the CWA TBEL regulations.

149. EPA and DOE did not examine factor (viii), which is "any consideration of use or potential use of affected resources in the requirement and the use or potential use of the affected resources at the CERCLA site."  EPA and DOE disregarded the fact that the State of Tennessee, as part of its delegated Clean Water Act program, has by regulation designated all of Bear Creek and its downstream waters for recreational use.  CWA TBEL regulations are designed to fully protect the designated use of water bodies like Bear Creek and its downstream waters.

150. The examination by EPA and DOE of the three factors they did evaluate in the EMDF ROD is deeply flawed, arbitrary and capricious.  Factor (i) is "the purpose of the requirement and the purpose of the CERCLA action."  According to EPA's long-standing interpretation of the role of federal environmental laws like the CWA as ARARs, published in preamble statements and guidance documents:

> These [other] federal environmental and public health laws were enacted
> with the goal of protecting public health and the environment. Regulations
> developed under these laws have imposed requirements that EPA and other
> Federal agencies deemed necessary to protect public health and the
> environment. Because protection of public health and the environment is
> also the goal of CERCLA's response actions, other Federal environmental
> and public health laws will normally provide a baseline or floor for
> CERCLA responses. National Oil and Hazardous Substances Pollution
> Contingency Plan, 50 Fed. Reg. 47912, 47917 (Nov. 20, 1985).

151. In the Wheeler Decision and in the EMDF ROD, both signed by EPA Administrators, EPA and DOE ignored and contradicted this established policy position when they determined that the CWA TBEL regulations are not ARARs because "CERCLA's purpose is not aligned with the purpose of the CWA's technology-based standards so consideration of Factor 1 does not support identification of CWA technology-based standards as relevant and appropriate here."  But as EPA has long recognized,

CERCLA's purpose – protection of human health and the environment – is fully aligned with the purpose of the Clean Water Act and its regulations requiring the development of effluent discharge limits based on the best available technology to achieve the objectives of the Clean Water Act, which include restoring and maintaining "the chemical, physical and biological integrity of the Nation's waters," protecting public health or welfare, and enhancing the quality of water.  In addition, CERCLA § 121's directives regarding the use of treatment technology to the maximum extent practicable are fully aligned with the CWA's reliance in the first instance on technology-based standards.

152. With regard to factor (iii), which is "the substances regulated by the requirement and the substances regulated at the CERCLA site," EPA and DOE incorrectly used a jurisdictional pre-requisite (the limited carve-out in the definition of "pollutant" in 40 C.F.R. §122.2 for certain, enumerated Atomic Energy Act-regulated radionuclides), ignoring and contradicting EPA's long-standing policy statement and interpretation of its own regulations that jurisdictional pre-requisites "*are not the basis for relevance and appropriateness*" determinations pursuant to 40 CFR § 300.400(g)(2).

153. With regard to factor (v), which is "any variances, waivers, or exemptions of the requirement and available for the circumstances at the CERCLA site," EPA and DOE incorrectly used the limited carve-out in the definition of "pollutant" in 40 C.F.R. §122.2 for certain, enumerated Atomic Energy Act-regulated radionuclides, ignoring and contradicting EPA's long-standing policy statement and interpretations of its own regulations which makes it clear that the exemptions referred to in this factor are those related to "specific circumstances where compliance with a requirement may be inappropriate for technical reasons or unnecessary to protect human health and the

environment."  EPA and DOE have not explained how either of these "specific cir-cumstances" is present at ORR, especially in light of the fact that 1) ion exchange treatment technology is a known, available, achievable and effective treatment technology, which is practicable, which can permanently and significantly reduce the volume, toxicity or mobility of radionuclides, and which has been and/or is being used by DOE at ORR to treat effluent discharges of radionuclides, and 2) Bear Creek and its downstream waters are designated by the State pursuant to its delegated Clean Water Act program for recreational use, and the State has posted  "Do Not Eat The Fish" signs on Bear Creek and its downstream waters.

154. Contrary to, and in violation of, the NCP requirements in 40 CFR § 300.400(g)(2), EPA and DOE failed to incorporate the CWA anti-degradation regulations promulgated by the State in the CERCLA remedy selection process for the EMDF landfill.  These state regulations, which are a pre-requisite to the delegation of the federal CWA program from EPA to the State, prohibit degradation of surface water below a level of quality necessary to protect the uses of the water body.  EPA and DOE arbitrarily and capriciously did not examine all the pertinent factors in § 300.400(g)(2) and their unreasonable and unpersuasive "examination" of the three factors they did address ignored and contradicted clear language in CERCLA, the NCP and EPA policy and guidance.

155. EPA and DOE did not examine factor (ii), which is "the *medium regulated or affected* by the requirement and the medium contaminated or affected at the CERCLA site."  The CWA regulates effluent discharges from point sources (like landfills) *into waters of the United States*.  Effluent discharges from the EMWMF landfill currently go

into Bear Creek and effluent discharges would continue to go into Bear Creek once the EMDF landfill is built. For purposes of determining whether CWA regulations are well-suited for use as ARARs for the remedies selected for the EMWMF and EMDF landfills, *Bear Creek clearly is a "medium regulated or affected"* by the CWA anti-degradation regulations.

156. EPA and DOE did not examine factor (iv), which is "the *actions or activities regulated* by the requirement and the remedial action contemplated at the CERCLA site." Again, the CWA regulates effluent *discharges from point sources (like landfills)* into waters of the United States. Effluent *discharges from the EMWMF landfill* currently go into Bear Creek and *effluent discharges* would continue to go into Bear Creek once the EMDF landfill is built. For purposes of determining whether CWA regulations are well-suited for use as ARARs for the remedies selected for the EMWMF and EMDF landfills, *discharging effluent from EMWMF and EMDF landfills i*nto Bear Creek clearly is an action or activity addressed by the CWA anti-degradation regulations.

157. EPA and DOE did not examine factor (viii), which is "any consideration of use or potential use of affected resources in the requirement and the use or potential use of the affected resources at the CERCLA site." EPA and DOE disregarded the fact that the State of Tennessee, as part of its delegated Clean Water Act program, has by regulation designated all of Bear Creek and its downstream waters for recreational use. CWA anti-degradation regulations are designed to fully protect the designated use of water bodies like Bear Creek and its downstream waters. The fact that DOE has impaired the water quality of Bear Creek by illegally discharging mercury, PCBs and radionuclides from the EMWMF landfill for over twenty years is not a valid basis for determining that further,

continuing degradation of Bear Creek is consistent with, or allowed by, the anti-degradation prohibition.

158. The Wheeler Decision's statement that "[a]nd, as provided in this decision, no discharges from an ORR landfill subject to CERCLA will impair water quality," has no basis in law or fact, and ignores the fact that the State had to post "Do Not Eat The Fish" signs on Bear Creek and its downstream waters at least as far back as 2016 due to the impairment of water quality caused by DOE.  At best, it represents wishful thinking. At a minimum, it is disingenuous.

159. The examination by EPA and DOE of the three factors they did evaluate is deeply flawed, arbitrary and capricious. With regard to factor (i), which is "the purpose of the requirement and the purpose of the CERCLA action." EPA and DOE did not explain how their analysis of the CWA TBEL regulations has any bearing on the State's anti-degradation regulations.  However, like the CWA TBEL regulations, the purpose of the anti-degradation prohibition in state regulations – to protect water quality from further degradation as a way of restoring and maintaining "the chemical, physical and biological integrity of the Nation's waters" – is fully aligned with CERCLA's purpose of protecting human health and the environment.

160. With regard to factor (iii), which is "the substances regulated by the requirement and the substances regulated at the CERCLA site," EPA and DOE incorrectly used a jurisdictional pre-requisite (the limited carve-out in the definition of "pollutant" in 40 C.F.R. §122.2 for certain, enumerated Atomic Energy Act-regulated radionuclides), ignoring and contradicting EPA's long-standing policy statement and interpretation of its own regulations that jurisdictional pre-requisites "*are not the basis for relevance and*

51

*appropriateness*" determinations pursuant to 40 CFR § 300.400(g)(2).  More importantly, the jurisdictional prerequisite language in the definition of "pollutant" in 40 C.F.R. §122.2 by its own explicit terms does not apply to 40 C.F.R. §131, the part of EPA's CWA regulations where the antidegradation requirement is found.

161. With regard to factor (v), which is "any variances, waivers, or exemptions of the requirement and available for the circumstances at the CERCLA site," EPA and DOE incorrectly used the limited carve-out in the definition of "pollutant" in 40 C.F.R. §122.2 for certain, enumerated Atomic Energy Act-regulated radionuclides.  EPA and DOE not only ignored the fact that the jurisdictional prerequisite language in the definition of "pollutant" in 40 C.F.R. §122.2 by its own explicit terms does not apply to 40 C.F.R. §131, the part of EPA's CWA regulations where the antidegradation requirement is found; EPA and DOE ignored and contradicted EPA's long-standing policy statement and interpretations of its own regulations which makes it clear that the exemptions referred to in this factor are those related to "specific circumstances where compliance with a requirement may be inappropriate for technical reasons or unnecessary to protect human health and the environment."  EPA and DOE have not explained how either of these "specific circumstances" is present at ORR, especially in light of the fact that 1) ion exchange treatment technology is a known, available, achievable and effective treatment technology, which is practicable, which can permanently and significantly reduce the volume, toxicity or mobility of radionuclides, and which has been and/or is being used by DOE at ORR to treat effluent discharges of radionuclides, and 2) Bear Creek and its downstream waters are designated by the State pursuant to its delegated Clean Water Act program for recreational use, and the State has posted  "Do Not Eat The Fish" signs on

Bear Creek and its downstream waters because of DOE's long-running polluting discharges which have impaired the water quality of Bear Creek and its downstream waters. EPA and DOE have not provided any credible justification for allowing a federal agency polluter to continue to degrade and impair the water quality of Bear Creek and its downstream waters.

162. EPA and DOE have provided no credible basis using the required NCP factors for finding that the antidegradation prohibition is not an ARAR for the purposes of establishing PRGs and effluent discharge levels for the radionuclides associated with landfill wastewater discharges from the EMWMF and the EMDF landfills into Bear Creek, while at the same time finding that the antidegradation prohibition is an ARAR for discharges of mercury and PCBs from those landfills. EPA and DOE have taken this irrational and internally inconsistent approach solely on the impermissible basis of the jurisdictional pre-requisite language in 40 C.F.R. §122.2, contrary to the NCP's required eight factors as they have been interpreted by EPA in long-standing, national, published policy statements and guidance documents, and in the 2019 RA Decision.

163. EPA and DOE either did not examine, or failed to properly examine, the NCP's pertinent factors with regard to the CWA regulations for TBELs and the anti-degradation provision. The administrative record contains no credible basis for finding that the CWA TBEL and anti-degradation regulations are not well-suited for the purposes of establishing PRGs and cleanup levels in the form of effluent discharge limits for the radionuclides associated with landfill wastewater discharges from EMWMF and EMDF into Bear Creek.

164. EPA and DOE also did not provide any meaningful explanation or credible support for its internally inconsistent consideration of the jurisdictional pre-requisite regarding factors (iii) and (v) when they determined that CWA WQBEL regulations and regulations requiring protection of Bear Creek's designated use are ARARs for purposes of the EMDF ROD.  Like the anti-degradation prohibition published in EPA regulations in 40 CFR § 131 (and adopted by the State in its CWA delegated program regulations), CWA regulations published in 40 CFR § 131 govern WQBELs and protection of the designated use; the limited jurisdictional carve-out in 40 CFR § 122.2 by its specific terms does not apply to 40 CFR § 131, yet EPA and DOE have applied it differently for the anti-degradation requirement on the one hand and WQBELs and protection of the designated use requirements on the other hand.

165. Contrary to, and in violation of, the NCP requirements in 40 CFR § 300.430(e)(2), EPA and DOE failed to identify and use readily available and sufficiently protective CWA TBEL and anti-degradation ARARs which are well-suited to the development of remedial action objectives, PRGs and remediation goals.

166. Contrary to, and in violation of, the NCP requirements in 40 CFR § 300.430(e)(9), EPA and DOE failed to develop and assess an alternative that would attain the CWA TBEL and anti-degradation ARARs, because EPA and DOE arbitrarily and capriciously eliminated those two ARARs from the CERCLA remedy selection process for the EMDF ROD.

167. Contrary to, and in violation of, the NCP requirements in 40 CFR § 300.430(f)(1), EPA and DOE failed to select CERCLA remedies in the EMDF ROD

which meet the threshold criteria in 40 CFR § 300.430(e)(9)(iii), because the CERCLA

remedies selected by EPA and DOE do not attain readily available CWA TBEL and anti-

degradation ARARs.

168. Contrary to, and in violation of, the NCP requirements in 40 CFR §

300.430(f)(5), EPA and DOE have failed to explain in the EMDF ROD how the

CERCLA remedies selected by EPA and DOE attain all available ARARs, including the

CWA TBEL and anti-degradation ARARs which were arbitrarily and capriciously

eliminated from the CERCLA remedy selection process.

169. EPA and DOE have effectively waived the CWA ARARs related to TBELs

and antidegradation in the EMDF ROD, without invoking, or providing a basis or

justification for invoking, a waiver based on CERCLA § 121(d)(4).

170. Contrary to EPA's long-standing, published policy statements and guidance

documents, EPA and DOE have ignored and contradicted relevant factors and have failed

to incorporate the best available treatment technology in accordance with the most

stringent CWA ARAR.  For example, in accordance with the preamble to the final NCP,

55 Fed. Reg. 8666, 8741: "*CERCLA requires* that remedial actions comply with *all*

requirements that are applicable or relevant and appropriate. *Therefore, a remedial action

has to comply with the most stringent requirement that is ARAR to ensure that all ARARs

are attained*."

171. As a result, EPA and DOE have failed to attain all available CWA ARARs

and as a result, also have failed to ensure protection of human health and the environment

when selecting CERCLA remedial actions for the EMDF landfill.

Failure to Attain Protective WQBEL ARARs

172. Contrary to, and in violation of, the requirements in CERCLA § 121(a), EPA and DOE failed to select "appropriate remedial actions… which are in accordance with this section and, to the extent practicable, the national contingency plan," in the EMDF ROD.

173. Contrary to, and in violation of, the requirements in CERCLA §121(d), EPA and DOE failed to incorporate protective CWA TBELs in the CERCLA and NCP remedy selection process for the EMDF ROD and instead improperly used federal and state water quality standards regulations to develop *less* stringent and not protective values for use in calculating effluent discharge limits for discharges from the EMDF landfill into Bear Creek and its downstream waters.  As a result, the remedial actions selected by EPA and DOE for the EMDF ROD do not attain all available ARARs and do not "attain a degree of cleanup of hazardous substances, pollutants, and contaminants released into the environment and of control of further release at a minimum which assures protection of human health and the environment."

174. Contrary to, and in violation of, the requirements in CERCLA §121(d)(2), EPA and DOE failed to select a remedial action in the EMDF ROD that attains all readily available and identified federal and more stringent state Clean Water Act ARARs.  EPA and DOE did not attain CWA WQBEL ARARs because the agencies arbitrarily and capriciously used incorrect inputs in developing unprotective PRGs for WQBELs related to effluent discharges from the landfills.

175. Contrary to, and in violation of, NCP requirements in 40 CFR § 300.430(e)(2), EPA and DOE developed and used PRGs for deriving unprotective WQBELs for

radionuclides even though CWA TBEL and anti-degradation ARARs are available and are sufficiently protective.

176. Contrary to, and in violation of, NCP requirements in 40 CFR § 300.430(e) (2), EPA and DOE failed to use a $10^{-6}$ risk level as the point of departure when the agencies inappropriately decided to determine remediation goals based on CWA WQBEL ARARs.

177. Contrary to long-standing, national, published EPA guidances which make it clear that the purpose of using an exposure duration of 70 years is to protect people who consume fish and shellfish over a lifetime and who originate from multiple jurisdictions, EPA and DOE used an exposure duration of 26 years in the EMDF ROD. EPA and DOE have not provided any scientific basis or reasoned explanation in the administrative record for why it is appropriate to use only a 26-year exposure duration -- which is used in the CERCLA program for residential settings based on how long on average people live in one place, not on a lifetime of exposure based on recreational fishing patterns – to derive PRGs for WQBELs for radionuclides for Bear Creek, which is designated by the State for recreational use pursuant to its delegated CWA authority; significantly, no one lives in Bear Creek. EPA and DOE have not provided any scientific basis or reasoned explanation in the administrative record for why it is appropriate to use a 70-year lifetime exposure assumption to derive WQBELs for mercury and PCBs in Bear Creek, but only a 26-year exposure assumption to derive WQBELs for radionuclides, when all these hazardous substances are carcinogenic, toxic, and/or bioaccumulative and according to long-standing EPA CERCLA guidance (e.g., *Preliminary Remediation Goals for Radionuclides*), are to be addressed in the same manner.

178. Contrary to long-standing, national published EPA guidance, EPA and DOE used an out-of-date 17.5 g/day fish consumption rate (FCR) for use in deriving the WQBELs for radionuclides for Bear Creek. The 17.5 g/day FCR is not based on current, scientifically sound information, and contradicts current EPA guidance. Since 2014, EPA's default national FCR has been 22 g/day, and its inland south FCR—which includes the State of Tennessee—has been set at 22.8 g/day since 2014.

179. EPA and DOE have used the out-of-date FCR even though State regulations published in TDEC Rule 0400-40-03-.02(10)) specifically require that "[i]nterpretation and application of narrative criteria shall be based on available scientific literature and EPA guidance and regulations." The narrative criteria "for the use of Recreation" covered by this requirement appear subsequently in the same State regulation.

180. EPA and DOE used incorrect inputs for exposure duration and FCR in calculating PRGs for WQBELs for radionuclides based on the Wheeler Decision. The Wheeler Decision stated that "EPA will not require use of default exposure assumptions from CWA guidance documents regarding fish consumption to develop PRGs, or any other default assumptions that are in dispute, such as ingestion." The Wheeler Decision, and subsequent documents prepared by EPA and DOE, did not provide a reasoned explanation justifying this deviation from long-standing, national published EPA guidance, which violates the FFA's requirements to implement the CERCLA cleanup at ORR "in accordance with" EPA policy and guidance, and "in accordance with" Tennessee law (which also requires the use of EPA guidance in carrying out the State's delegated CWA program).

181. By using incorrect inputs for exposure duration and FCR, EPA and DOE have selected a remedial action in the EMDF ROD which does not attain any of the CWA ARARs and does not ensure protectiveness of human health and the environment. For iodine-129, EPA's PRG derived in 2019, for purposes of the RA Decision and calculated in accordance with CERCLA, the NCP, and existing CERCLA and CWA guidance using a 10-6 point of departure, was 0.196 picocuries per liter (pCi/L). The PRG EPA and DOE selected in the EMDF ROD is 10.2 pCi/L, or more than 50 times higher. For strontium-90, the difference is 1.127 pCi/L (2019 EPA) and 47.9 pCi/L (EMDF ROD), or 40 times higher. For uranium-235 and uranium-236, the difference is 1.757 pCi/L (2019 EPA) and 455 pCi/L (EMDF ROD), or 259 times higher. And for technetium-99 (Tc-99), which according to EPA has a half-life of more than 200,000 years, the difference is 22.23 pCi/L (2019 EPA) and 1,000 pCi/L (EMDF ROD), or 45 times higher. The EMDF ROD's PRGs exceed the State water quality regulations' 1x10-5 target risk level for all carcinogens when the differences for just these five radionuclides between the PRG value calculated by EPA in 2019 and EMDF ROD's PRG value are compared.

182. EPA and DOE have undermined the CWA ARARs related to WQBELs in a manner that effectively waives those ARARs without invoking, or providing a basis or justification for invoking, a waiver based on CERCLA § 121(d)(4).

Failure to Protect the Designated Use of Bear Creek and its Downstream Waters

183. Contrary to, and in violation of, the requirements in CERCLA § 121(a), EPA and DOE failed to select "appropriate remedial actions… which are in accordance with this section and, to the extent practicable, the national contingency plan," in the EMDF ROD.

184. Contrary to, and in violation of, the requirements in CERCLA §121(d), EPA and DOE failed to incorporate protective CWA TBELs in the CERCLA and NCP remedy selection process for the EMDF ROD and instead improperly used federal and state water quality standards regulations to develop *less* stringent and not protective values for use in calculating effluent discharge limits for discharges from the EMDF landfill into Bear Creek and its downstream waters.  As a result, the remedial actions selected by EPA and DOE for the EMDF ROD do not attain all available ARARs and do not "attain a degree of cleanup of hazardous substances, pollutants, and contaminants released into the environment and of control of further release at a minimum which assures protection of human health and the environment."

185. Contrary to, and in violation of, the requirements in CERCLA §121(d)(2), EPA and DOE failed to select a remedial action in the EMDF ROD that attains all readily available and identified federal, and more stringent state, Clean Water Act ARARs.

186. EPA and DOE failed to attain CWA ARARs requiring the full protection of the State's promulgated designated use of Bear Creek and its downstream waters when the agencies selected CERCLA remedial actions for the EMDF landfill which do not fully protect the recreational use for, and users of, Bear Creek and its downstream waters.

187. EPA and DOE have not provided any justification explaining why recreational users of Bear Creek and downstream waters should get less than the full protection required by law when compared to recreational users of other water bodies in Tennessee and in other states.

188. EPA and DOE have not provided any justification for giving radionuclides preferential treatment when addressing discharges of landfill

wastewater from the EMWMF and EMDF landfills which also contain other pollutants that are equally toxic, carcinogenic, and/or bioaccumulative.

189. EPA and DOE have undermined the CWA ARARs related to protection of the State's designated uses of Bear Creek and its downstream waters in a manner that effectively waives those ARARs without invoking, or providing a basis or justification for invoking, a waiver based on CERCLA § 121(d)(4).

190. Contrary to EPA's long-standing, published policy statements and guidance documents, EPA and DOE have ignored and contradicted relevant factors and have failed to incorporate the best available treatment technology and anti-degradation requirements in accordance with the most stringent CWA ARARs.  EPA and DOE have failed to attain all available CWA ARARs, and as a result have failed to ensure protection of human health and the environment when selecting CERCLA remedial actions for the EMDF landfill.

Failure to Attain Any CWA ARARs in the EMWMF ROD

191. Contrary to, and in violation of, the requirements in CERCLA § 121(a), EPA and DOE failed to select "appropriate remedial actions… which are in accordance with this section" in the EMWMF ROD.

192. Contrary to, and in violation of, the requirements in CERCLA §121(d), EPA and DOE failed to incorporate any protective CWA ARARs in the CERCLA and NCP remedy selection process for the EMWMF ROD.

193. Contrary to, and in violation of, the requirements in CERCLA §121(d)(2), EPA and DOE failed to select remedial actions in the EMWMF ROD that attains all

readily available and identified federal, and more stringent state, Clean Water Act ARARs.

194. Contrary to, and in violation of, the requirements in CERCLA § 121(a), EPA and DOE failed to select "appropriate remedial actions… which are in accordance with … the national contingency plan" in the EMWMF ROD.

195. Contrary to, and in violation of, the NCP requirements in 40 CFR § 300.400(g)(2), EPA and DOE failed to examine the pertinent factors for evaluating and incorporating potential CWA ARARs in the CERCLA remedy selected in the EMWMF ROD.

196. Contrary to, and in violation of, the NCP requirements in 40 CFR § 300.430(e)(2), EPA and DOE failed in the EMWMF ROD to identify and use readily available and sufficiently protective CWA TBEL and anti-degradation ARARs which are well-suited to the development of remedial action objectives, PRGs and remediation goals.

197. Contrary to, and in violation of, the NCP requirements in 40 CFR § 300.430(e)(9), EPA and DOE failed to develop and assess an alternative in the EMWMF ROD which would attain the CWA TBEL and anti-degradation ARARs.

198. Contrary to, and in violation of, the NCP requirements in 40 CFR § 300.430(f)(1), EPA and DOE failed to select a CERCLA remedy for the EMWMF landfill which meets the threshold criteria in 40 CFR § 300.430(e)(9)(iii) because the CERCLA remedy does not attain readily available CWA TBEL and anti-degradation ARARs.

199. Contrary to, and in violation of, 40 CFR § 300.430(f)(5), EPA and DOE failed to explain in the EMWMF ROD how the CERCLA remedy selected by EPA and

DOE attains all available ARARs, including the CWA TBEL and anti-degradation ARARs.

200. EPA and DOE failed to attain CWA ARARs requiring the full protection of the State's promulgated designated use of Bear Creek and its downstream waters when the agencies selected CERCLA remedial actions for the EMWMF landfill which do not fully protect the recreational use for, and users of, Bear Creek and its downstream waters.

201. EPA and DOE have not provided any justification explaining why recreational users of Bear Creek and downstream waters should get less than the full protection required by law when compared to recreational users of other water bodies in Tennessee and in other states.

202. EPA and DOE have not provided any justification for giving radionuclides preferential treatment when addressing discharges of landfill wastewater from the EMWMF landfill which also contain other pollutants that are equally toxic, carcinogenic, and/or bioaccumulative.

203. EPA and DOE have effectively waived all the CWA ARARs in the EMWMF ROD without invoking, or providing a basis or justification for invoking, a waiver based on CERCLA § 121(d)(4).

204. Contrary to EPA's long-standing, published policy statements and guidance documents, EPA and DOE have ignored and contradicted relevant factors and have failed to incorporate the best available treatment technology and anti-degradation requirements in accordance with the most stringent CWA ARAR when they selected the CERCLA remedy in the EMWMF ROD. As a result, EPA and DOE have failed to attain all available CWA ARARs and as a result, also have failed to ensure protection of human

health and the environment when selecting CERCLA remedial actions for the EMWMF

landfill.

The Improper Waiver of TSCA Regulations

205. EPA and DOE have invoked a waiver of TSCA PCB regulations in the

EMDF ROD without providing a basis or justification for such a waiver.  The EMDF

ROD indicates that "DOE is seeking a TSCA waiver for two portions of a TSCA siting

requirement under 40 CFR 761.75(b)(3) for the selected remedy, as allowed under TSCA

40 CFR 761.75(c)(4); the waivers are granted via approval of this ROD."

206. The waivers would excuse the EMDF landfill from certain site hydrologic

conditions: "The bottom of the landfill shall be above the historical high groundwater

table as provided below. Floodplains, shorelands, and groundwater recharge areas shall be

avoided. There shall be no hydraulic connection between the site and standing or flowing

surface water. The site shall have monitoring wells and leachate collection. The bottom of

the landfill liner system or natural in-place soil barrier shall be at least fifty feet from the

historical high-water table."

207. A TSCA waiver under TSCA 40 CFR 761.75(c)(4) may be available if

evidence has been submitted that the landfill operation "…will not present an

unreasonable risk of injury to health or the environment from PCBs when one or more of

the requirements of paragraph (b) of this section are not met."

208. The EMDF ROD itself indicates that additional sampling is needed to fully

characterize the ground water table underneath the proposed landfill.  In addition, the State

indicated a few days before the EMDF ROD was signed that additional characterization

information regarding the high-water table is missing and still necessary.

209. EPA and DOE have not provided sufficient actual data and information – including documentation showing actual knowledge of and knowing approval of the factual basis for the "no unreasonable risk" determination by the EPA Administrator before or when he signed the EMDF ROD -- to demonstrate how siting the new landfill without a 50-foot buffer meets all of the requirements in 40 CFR 761.75.

210. Even if all the requirements in 40 CFR 761.75 were to be met, the EMDF ROD does not show how siting the new landfill without a 50-foot buffer between the bottom of the proposed landfill and the top of the aquifer would ensure protectiveness of human health and the environment in accordance with CERCLA, the NCP and existing EPA guidance, given the documented, extensive and dangerous existing ground water contamination caused by DOE's past and ongoing actions at this portion of ORR.

The Improper Waiver of TDEC Land Disposal Facility Regulations

211. In the EMDF ROD, EPA and DOE have invoked a waiver from technical requirements for land disposal facilities published in TDEC regulations at § 0400-20-11-.17(1)(h) without providing an adequate basis or justification for such a waiver.

212. TDEC § 0400-20-11-.17(1)(h) states: "The hydrogeologic unit used for disposal shall not discharge groundwater to the surface within the disposal site."

213. Pursuant to TDEC § 0400-20-04-.08:

The Department may, upon application by any person or upon its own initiative, grant exemptions, variances, or exceptions from the requirements of these regulations which are not prohibited by statute and which will not result in undue hazard to public health and safety or property.

214. The EMDF ROD on page 2-83 states: "The exemption to TDEC 0400-20-11-.17(1)(h) is approved through approval of this ROD."

215. TDEC § 0400-20-04-.08's standard for granting an exemption is not consistent with permissible ARAR waivers pursuant to CERCLA § 121(d)(4), and as applied by DOE in the EMDF ROD, is not consistent with RCRA subtitle C requirements for hazardous waste landfills.

216. Section 2.13.2.3 of the EMDF ROD discusses the waiver of TDEC § 0400-20-11-.17(1)(h).  At page 2-81, the EMDF ROD states:

> The onsite location proposed for the EMDF does not consistently (e.g., based on seasonal precipitation) meet this criterion for the current (pre-construction) site hydrogeologic features. Varying degrees of groundwater discharge to the surface at this site, depending on seasonal rainfall contributions. Discharge of groundwater through seeps/springs/intermittent streams may range from zero discharge during dry seasons to continuous discharge during wet seasons…. In addition, [low level waste (LLW)] land disposal facilities placed in this type of hydrogeologic setting must also rely on limiting acceptance of radionuclides and final inventories to further ensure the protection of human health and the environment.

217. DOE has not provided sufficient data and information to determine that proceeding with the EMDF landfill "will not result in undue hazard to public health and safety" before or when the EMDF ROD was signed.

218. With regard to "limiting acceptance of radionuclides and final inventories to further ensure the protection of human health and the environment," the EMDF ROD does not establish Waste Acceptance Criteria in a manner that limits disposal of radionuclides to those with half-lives of 30 years or less referenced in section 2.13.2.3 and consistent with the EMDF liner and buffer design described in section 2.13.2.1 of the EMDF ROD.  A waiver of TDEC § 0400-20-11-.17(1)(h) cannot be justified before issuance of a final WAC which precludes disposal of radionuclides with half-lives of more than 30 years.

219. Waiver of TDEC 0400-20-11-.17(1)(h) in section 2.13.2.3 references that the EMDF liner and buffer design, as noted under section 2.13.2.1, provides an estimated 250 years of travel time between the bottom of waste and the water table. The EMDF ROD does not provide sufficient information to support a waiver of TDEC § 0400-20-11-.17(1)(h) based on a low permeability geologic buffer "to ensure a minimum unsaturated material thickness of 10 ft above the seasonal high water table of the uppermost unconfined aquifer or the top of the formation of a confined aquifer (consistent with TDEC 0400-11-01-.04[4][a][2])," as described in section 2.13.2.1.  In fact, the EMDF ROD itself indicates that additional sampling is needed to fully characterize the groundwater table underneath the proposed landfill; similarly, the State indicated a few days before the EMDF ROD was signed that additional characterization information regarding the high-water table is missing and still necessary.  A waiver cannot be not justified if DOE does not know where the seasonal high water table is and therefore cannot tell whether a 10' buffer between the bottom of the proposed landfill and the top of the water table is even possible and sustainable.

216. The justification for a waiver provided in section 2.13.2.3 of the EMDF ROD relies on a complicated liner system:

> The liner system includes 3 ft of compacted clay, multiple geosynthetic layers, a 1-ft leachate collection drainage layer, and a final 1-ft protective material layer (5 ft total), above which the waste is placed (consistent with RCRA requirements). The geosynthetic layers are low permeability materials that have been simulated in multiple independent tests to function for many centuries. These features will isolate the short-lived radionuclides so that decay occurs in place; therefore, they will minimize risk to human health or the environment. The geosynthetic materials ensure that leachate does not contaminate the underlying groundwater during the service life of the synthetic liner components.

217. The ROD justification for the waiver in section 2.13.2.3 specifies that "[t]he EMDF liner and buffer design, as noted under Sect 2.13.2.1, provides an estimated 250 years of travel time between the bottom of waste and the water table. This time is sufficient to allow for 8 half-lives for radioisotopes with half-lives up to 30 years...."In "Performance Assessment for the Environmental Management Disposal Facility at the Y-12 National Security Complex, Oak Ridge, Tennessee" April 2020 (UCOR-5094/R2), DOE recognizes that a "bathtub scenario" is possible for the EMDF landfill: "Under this scenario, the waste cells would start to accumulate water and portions of the waste may become saturated, potentially impacting facility performance." As a result, "waste could become saturated and static water pressure in the waste zone is assumed to cause leachate seepage along the perimeter of the liner at the lowest point of intersection with the cover." Given this possibility and possible impacts on groundwater and surface water, a waiver of TDEC § 0400-20-11-.17(1)(h) is not justified based on the information provided by DOE in the EMDF ROD and in the administrative record supporting that remedy selection decision.

218. The standard for granting an exemption under TDEC § 0400-20-04-.08 – "will not result in undue hazard to public health" – is less stringent than the CERCLA standard requiring all remedial actions to ensure protectiveness of human health and the environment. The EMDF ROD does not show how allowing the selected remedial action to proceed with the waiver of TDEC § 0400-20-11-.17(1)(h) would ensure protectiveness of human health and the environment in accordance with CERCLA, the NCP and existing EPA guidance, given the documented, extensive and dangerous existing groundwater

contamination caused by DOE's past and ongoing actions at this portion of ORR and in light of additional contamination coming from the EMDF in the future.

Failure to Use Treatment Technology to the Maximum Extent Practicable

219. Contrary to, and in violation of, the requirements in CERCLA § 121(a), EPA and DOE failed to select CERCLA remedial actions for the EMWMF and EMDF landfills which are in accordance with that section of the statute and which are in accordance with the NCP.

220. Contrary to, and in violation of, the requirements in CERCLA §121(b), EPA and DOE failed to conduct an assessment of ion exchange resin treatment technology for the CERCLA remedies  selected in the EMWMF ROD and in the EMDF ROD, even though ion exchange resin treatment technology is a known, available, achievable and effective treatment technology, is practicable, can permanently and significantly reduce the volume, toxicity or mobility  of radionuclides, and has been and/or is being used by DOE at ORR to treat effluent discharges of radionuclides.

221. Contrary to, and in violation of, the requirements in CERCLA §121(b), EPA and DOE failed to develop remedial action alternatives during the CERCLA remedy selection process for the EMWMF ROD and the EMDF ROD addressing or analyzing the use of ion exchange resin treatment technology to treat effluent discharges of radionuclides into Bear Creek.

222. Contrary to, and in violation of, the requirements in CERCLA §121(b), EPA and DOE in the CERCLA remedy selection process for the EMWMF ROD and the EMDF ROD failed to prefer remedial actions using ion exchange resin treatment technology, which is a known, available, achievable and

effective treatment technology, which is practicable, which can permanently and significantly reduce the volume, toxicity or mobility of radionuclides, and which has been and/or is being used by DOE at ORR to treat effluent discharges of radionuclides.

223. Contrary to, and in violation of, the requirements in CERCLA §121(b), EPA and DOE did not select CERCLA remedial actions for the EMWMF and EMDF landfills that utilize permanent solutions and alternative treatment technology (e.g., ion exchange resin treatment technology) to the maximum extent practicable.

224. Contrary to requirements in CERCLA §121(b), EPA and DOE failed to publish an explanation as to why the selected CERCLA remedial actions for the EMWMF and EMDF landfills did not consider or adopt ion exchange resin treatment technology which is a known, available, achievable and effective treatment technology, which is practicable, which can permanently and significantly reduce the volume, toxicity or mobility of radionuclides, and which has been and/or is being used by DOE at ORR to treat effluent discharges of radionuclides.

225. Contrary to, and in violation of, the NCP requirements in 40 C.F.R. §300.430(a)(1)(i), EPA and DOE failed to select remedies in the EMWMF ROD and the EMDF ROD "that minimize untreated waste" using the best available treatment technology to the maximum extent practicable.

226. Contrary to, and in violation of, the NCP requirements in 40 CFR § 300.430(a)(iii), EPA and DOE failed to consider ion exchange resin treatment technology

in developing appropriate remedial alternatives for the CERLA remedies for the
EMWMF and EMDF landfills, failed to  place a priority on treating highly toxic and
highly mobile effluent from the EMWMF and EMDF landfills discharged into Bear
Creek and its downstream waters, and failed to adopt a CERCLA remedial action
alternative incorporating the best available treatment technology (e.g., ion exchange resin
treatment technology) which is a known, available, achievable and effective treatment
technology, which is practicable, which can permanently and significantly reduce the
volume, toxicity or mobility  of radionuclides, and which has been and/or is being used
by DOE at ORR to treat effluent discharges of radionuclides.

227. Contrary to, and in violation of, the NCP requirements in 40 CFR §
300.430(e)(2), EPA and DOE failed to develop a CERCLA remedial action alternative in
the EMWMF ROD and in the EMDF ROD incorporating the best available treatment
technology (e.g., ion exchange resin treatment technology).

228. Contrary to, and in violation of, the NCP requirements in 40 CFR §
300.430(e)(2), EPA and DOE in the EMWMF ROD and in the EMDF ROD failed to
develop remedial action objectives, PRGs or remediation goals incorporating the best
available treatment technology (e.g., ion exchange resin treatment technology) for the
radioactive effluent discharges into Bear Creek and its downstream waters.

229. Contrary to, and in violation of, the NCP requirements in 40 CFR §
300.430(e)(9)(i), EPA and DOE, in the CERCLA remedy selection process for the
EMWMF and EMDF landfills, failed to conduct a detailed analysis of an alternative
incorporating the best available treatment technology (e.g., ion exchange resin treatment
technology) which is a viable, known, available, achievable and effective treatment

technology, which is practicable, which can permanently and significantly reduce the volume, toxicity or mobility of radionuclides, and which has been and/or is being used by DOE at ORR to treat effluent discharges of radionuclides.

230. Contrary to, and in violation of, the NCP requirements in 40 CFR 40 CFR § 300.430(e)(9)(iii)(A), EPA and DOE, in the CERCLA remedy selection process for the EMWMF and EMDF landfills, failed to assess an alternative incorporating the best available treatment technology (e.g., ion exchange resin treatment technology) which is a viable, known, available, achievable and effective treatment technology, which is practicable, which can permanently and significantly reduce the volume, toxicity or mobility of radionuclides, which has been and/or is being used by DOE at ORR to treat effluent discharges of radionuclides, and which can adequately protect human health and the environment in both the short- and long-term from unacceptable risks posed by the discharge of effluent containing radionuclides from the EMWMF and EMDF landfills by, at a minimum, reducing and controlling exposures to levels within the NCP's excess cancer risk range. EPA and DOE failed to assess how the best available treatment technology (e.g., ion exchange resin treatment technology) reduces toxicity, mobility or volume of effluent discharges of radionuclides from the EMWMF and EMDF landfills.

231. Contrary to, and in violation of, the NCP requirements in 40 CFR § 300.430(f)(1), EPA and DOE failed to use the criteria in 40 CFR § 300.430(e)(9)(iii) to evaluate an alternative incorporating the best available treatment technology (e.g., ion exchange resin treatment technology) when the agencies selected CERCLA remedies for the EMWMF and EMDF landfills.

232. Contrary to, and in violation of, the NCP requirements in 40 CFR § 300.430(f)(5), EPA and DOE failed to explain in the EMWMF ROD how the CERCLA remedy selected by EPA and DOE satisfies the preference for remedies employing treatment which permanently and significantly reduce the toxicity, mobility, or volume of the hazardous substances, to the maximum extent practicable, since EPA and DOE failed to identify, develop and select an alternative incorporating the best available treatment technology (e.g., ion exchange resin treatment technology) as part of the CERCLA remedy selection process. EPA and DOE failed to explain in the EMWMF ROD why the CERCLA remedy selected in that ROD does not include the best available treatment technology (e.g., ion exchange resin treatment technology) to achieve reductions in toxicity, mobility, or volume.

233. Contrary to, and in violation of, the NCP requirements in 40 CFR § 300.430(f)(5), EPA and DOE failed to explain in the EMDF ROD how the CERCLA remedy selected by EPA and DOE satisfies the preference for remedies employing treatment which permanently and significantly reduce the toxicity, mobility, or volume of the hazardous substances, to the maximum extent practicable, since EPA and DOE have failed to identify, develop and select an alternative incorporating the best available treatment technology (e.g., ion exchange resin treatment technology) as part of the CERCLA remedy selection process. EPA and DOE failed to explain in the EMDF ROD why the CERCLA remedy selected in that ROD does not include the best available treatment technology (e.g., ion exchange resin treatment technology) to achieve reductions in toxicity, mobility, or volume.

234. Actual numbers are accurate benchmarks for showing what happens when ARARs are not properly attained and the best available treatment technology is not used to the maximum extent practicable.  As just one example, for technetium – 99, one of the many radionuclides at issue here, using the best available technology (including ion exchange resin treatment technology which DOE is using or has used at ORR elsewhere and at its other facilities and which therefore undisputably is "practicable") can meet a TBEL of approximately 3 pCi/L.  A properly calculated PRG for WQBELs for Tc-99 following the NCP and EPA guidance and methodology is 22.2 pCi/L, ten times less stringent than the TBEL.  The Tc-99 value in the EMDF ROD value is 1000 pCi/L, more than 300 times less stringent than the TBEL.  By failing to incorporate the best available treatment technology in accordance with the most stringent CWA ARAR, EPA and DOE have failed to ensure protection of human health and the environment.

235. Contrary to EPA's long-standing, published policy statements and guidance documents, EPA and DOE have ignored and contradicted relevant factors and have failed to assess and incorporate the use of treatment technologies to the maximum extent practicable in selecting CERCLA remedial actions for the EMWMF and EMDF landfills.

Failure to Ensure Protectiveness of Human Health and the Environment

236. Contrary to, and in violation of, the requirements in CERCLA § 121(a), EPA and DOE failed to select "appropriate remedial actions… which are in accordance with this section."

237. Contrary to, and in violation of, the requirements in CERCLA §121(b), EPA and DOE failed to "select a remedial action *that is protective of human health and the environment*" when they issued the EMWMF ROD in 1999 and the EMDF ROD in 2022.

238. Contrary to, and in violation of, the requirements in CERCLA § 121(d)(1), EPA and DOE failed to select CERCLA remedial actions in the EMWMF ROD and in the EMDF ROD which "attain a degree of cleanup of hazardous substances, pollutants, and contaminants released into the environment and of control of further release *at a minimum which assures protection of human health and the environment.*"

239. Contrary to, and in violation of, the requirements in CERCLA § 121(a), EPA and DOE failed to select "appropriate remedial actions… which are in accordance with … the national contingency plan."

240. Contrary to, and in violation of, the NCP requirements in 40 C.F.R. §300.430(a)(1)(i), EPA and DOE selected CERCLA remedies in the EMWMF ROD and in the EMDF ROD which are not "protective of human health and the environment," do not "maintain protection over time," and do not "minimize untreated waste."

241. The 1999 EMWMF landfill ROD does not establish effluent discharge limits for mercury, PCBs or radionuclides, and DOE has been illegally discharging effluent from the landfill into Bear Creek and its downstream waters, which the State has posted with "Do Not Eat The Fish" signs.  The 2022 EMDF ROD does not establish effluent discharge limits for mercury, PCBs or radionuclides for effluent discharges from the landfill into Bear Creek and its downstream waters.  The PRGs in the 2022 EMDF ROD Table 2.9 for effluent discharges from the EMDF into Bear Creek and its downstream waters are not based on the most stringent, readily available ARARs and result in a cumulative risk in excess 1 x 10-4, outside the NCP's established excess cancer risk defining acceptable risk; as a result, they do not ensure protectiveness of human health and the environment.

242. Contrary to, and in violation of, the NCP requirements in 40 CFR § 300.430(e)(2), EPA and DOE failed to determine "final remediation goals… when the remedy is selected" in the EMWMF ROD and in the EMDF ROD, and failed to develop and establish remediation goals "that are protective of human health and the environment… by considering … applicable or relevant and appropriate requirements under federal environmental or state environmental or facility siting laws" which have been identified and are available.

243. Contrary to, and in violation of, the NCP requirements in 40 CFR § 300.430(e)(9)(iii)(A), EPA and DOE, in the CERCLA remedy selection process for the EMWMF and EMDF landfills, failed to assess the full range of alternatives "to determine whether they can adequately protect human health and the environment, in both the short- and long-term, from unacceptable risks posed by hazardous substances, pollutants, or contaminants present at the site by eliminating, reducing, or controlling exposures to levels established during development of remediation goals consistent with § 300.430(e)(2)(i)."  In addition, in the EMWMF ROD and in the EMDF ROD, EPA and DOE failed to ensure overall protection of human health and the environment because they have not adequately drawn "on the assessments of other evaluation criteria, especially long-term effectiveness and permanence, short-term effectiveness, and compliance with ARARs."

244. Contrary to, and in violation of, the NCP requirements in 40 CFR § 300.430(f)(1), EPA and DOE failed to select CERCLA remedies for the EMDF landfill which meet the threshold criteria in 40 CFR § 300.430(e)(9)(iii) because the CERCLA remedies result in a cumulative risk in excess 1 x 10-4, outside the NCP's established

excess cancer risk defining acceptable risk, and therefore result in a CERCLA remedial action that does not protect human health and the environment.

245. Contrary to, and in violation of, NCP requirements in 40 CFR § 300.430(f)(5), EPA and DOE failed to explain in the EMWMF ROD how the CERCLA remedy selected by EPA and DOE ensures protection of human health and the environment when no protective effluent discharge limits governing discharges of mercury, PCBs, and radionuclides from the landfill into Bear Creek and its downstream waters have ever been developed and selected as part of a CERCLA remedy selection process or as part of a CWA § 402 permit. EPA and DOE failed to explain in the EMWMF ROD how the CERCLA remedy selected is protective of human health and the environment when DOE has been illegally discharging effluent into Bear Creek for over twenty years, and how the CERCLA remedial action is protective in light of the fact that after the landfill began operating the State posted "Do Not Eat the Fish" signs on Bear Creek in 2016 because the State determined it is not safe to eat fish recreationally caught in that stream and its downstream waters (also posted with "Do Not Eat the Fish" signs).

246. Contrary to, and in violation of, NCP requirements in 40 CFR § 300.430(f)(5), EPA and DOE failed to explain in the EMDF ROD how the final CERCLA remedy selected by EPA and DOE ensures protection of human health and the environment when protective effluent discharge limits governing discharges of mercury, PCBs, and radionuclides from the landfill into Bear Creek and its downstream waters have not been developed and selected as part of a CERCLA remedy selection process. EPA and DOE failed to explain in the EMDF ROD how the final CERCLA remedy selected is protective of human health and the environment when the values selected in the EMDF ROD result

in a cumulative risk in excess 1 x 10-4, outside the NCP's established excess cancer risk defining acceptable risk.

Failure to Carry Out a Five Year Review That Complies with CERCLA § 121(c) and Demonstrates the Original Remedy Selected in the EMWMF ROD is protective of human health and the environment

247. The 1999 ROD for the existing EMWMF landfill never had, and still does not have, any discharge limits for the effluent from the landfill containing CERCLA hazardous substances going into Bear Creek and its downstream waters.  In addition, no CWA § 402 permit has been issued setting effluent discharge limits for the effluent from the landfill going into Bear Creek and its downstream waters.

248. EPA and DOE have acknowledged that the water quality in Bear Creek and its downstream waters is impaired; this impairment is specifically mentioned in the Wheeler Decision.  In 2016, the State posted "Do Not Eat The Fish" signs on Bear Creek, after determining that recreational fishing is not safe. The State also has posted "Do Not Eat The Fish" signs on Bear Creek's downstream waters.

249. Contrary to, and in violation of, the requirements in CERCLA §121(c) and the NCP, and contrary to EPA's long-standing, published policy statements and guidance documents (including the *Comprehensive Five Year Review Guidance)*,  EPA and DOE failed to prepare five-year review reports for the 1999 EMWMF ROD explaining and determining how the CERCLA remedy selected in that ROD, which allows discharges of effluent containing hazardous substances including mercury, PCBs, and radionuclides from the EMWMF landfill into Bear Creek and its downstream waters without establishing any effluent

discharge limits for those hazardous substances, is ensuring protection of human health and the environment.

Failure to Follow the CERCLA and NCP Remedy Selection Process for the EMDF landfill

250. EPA and DOE did not properly prepare and publish a complete proposed plan, and a final, complete RI/FS or FFS approved by EPA and TDEC prior to the publication of a proposed plan.

251. Among other deficiencies, EPA and DOE did not prepare and publish a final RI/FS, FFS or proposed plan which: contained a baseline risk assessment and a human health risk assessment prepared in accordance with EPA guidance methodology; fully characterized the nature and extent of contamination; and, fully addressed the wastewater discharge issue (e.g., use of all available CWA ARARs, use of treatment to the maximum extent practicable). EPA and DOE failed to take these required steps even though both agencies knew (e.g., as discussed in DOE annual environmental reports such as the Remediation Effectiveness Report, and as raised in writing by TDEC when initiating the wastewater dispute in 2016) about the elevated levels of surface water pollution already in Bear Creek caused by DOE operations (including operation of the EMWMF landfill), and even though the EMDF ROD admits, among other things, that "[t]reatment of landfill wastewater from EMDF, however, is *a key component of the remedy."*

252. By not completing, publishing and making these documents available for the public prior to the issuance of the EMWMF ROD and the EMDF ROD, EPA and DOE precluded meaningful public participation in the CERCLA remedy selection process and made arbitrary and capricious remedy selection decisions.

79

253. Contrary to, and in violation of, the requirements in CERCLA §113 and § 117, EPA and DOE failed to prepare and make available a proposed plan prior to issuing the EMWMF ROD or the EMDF ROD containing effluent discharge limits for discharges from the two landfills into Bear Creek and its downstream waters. EPA and DOE failed to prepare, and make available prior to the publication of such a proposed plan addressing effluent discharge limits from the two landfills, a finalized and approved Remedial Investigation/Feasibility Study or Focused Feasibility Study, or information or reasonable explanation of the proposed plan and alternative proposals considered, and did not provide meaningful responses to significant comments made by interested parties regarding the lack of such effluent discharge limits, as well as other deficiencies and concerns regarding the failure to fully characterize the site, failure to prepare adequate risk assessments, and failure to provide specific WACs.

254. Contrary to, and in violation of, the requirements in CERCLA § 113 and § 117, EPA and DOE failed to publish and make available to the public a CERCLA proposed plan for either the EMWMF or EMDF landfills which addresses alternatives adopting, or addresses the use of, ion exchange resin treatment technology to treat effluent discharges of radionuclides into Bear Creek from the landfills. In addition, EPA and DOE failed to publish and make available to the public a CERCLA proposed plan for either the EMWMF landfill or the EMDF landfill which includes sufficient information providing a reasonable explanation of the scientific basis for concluding that the PRGs developed by EPA and DOE related to effluent discharges of radionuclides into Bear Creek are protective of human health and the environment when the cumulative risk of the values selected results in remedial actions which pose a cancer risk in excess 1 x 10-4,

and do not protect the designated recreational use for, and users of, Bear Creek and its downstream waters.

256. Contrary to, and in violation of, the requirements in CERCLA § 113 and § 117, EPA and DOE failed to provide a meaningful response to significant comments, criticisms and data submitted by stakeholders, and have sidestepped those comments and criticisms. Despite the fact that stakeholders were not provided with a proposed plan and sufficient supporting information related to the use of ion exchange resin treatment technology and the development of PRGs for effluent discharge limits for the EMWMF and EMDF landfills, the stakeholders still managed to raise significant comments and criticisms concerning the lack of a proposed plan and supporting information related to the development of effluent discharge limits, based on the limited and incomplete information provided by EPA and DOE.

257. Contrary to, and in violation of, the NCP requirements in 40 CFR § 300.430(f)(1), EPA and DOE failed to use the criteria in 40 CFR § 300.430(e)(9)(iii) to evaluate an alternative incorporating the best available treatment technology (e.g., ion exchange resin treatment technology) when the agencies selected CERCLA remedies for the EMWMF and EMDF landfills.

258. Contrary to, and in violation of, the NCP requirements in 40 CFR § 300.430(f)(1), EPA and DOE failed to select CERCLA remedial actions for the EMWMF and EMDF landfills which meet the threshold criteria in 40 CFR § 300.430(e)(9)(iii) because: 1) the CERCLA remedies at a minimum result in a cumulative risk in excess 1 x 10-4, outside the established excess cancer risk defining acceptable risk in the NCP; and, 2) the CERCLA remedies do not attain readily available CWA TBEL, anti-degradation,

properly calculated protective WQBEL, and protection of designated use ARARs, and

EPA and DOE did not invoke or justify a waiver of these CWA ARARs pursuant to

CERCLA § 121(d)(4) or 40 CFR § 300.430(f)(1)(ii)(C).

259. Contrary to, and in violation of, the NCP requirements in 40 CFR §

300.430(f)(1), EPA and DOE failed to identify and present to the public a proposed plan

which includes an alternative incorporating the best available treatment technology (e.g.,

ion exchange resin treatment technology). The final CERCLA remedy selection

decisions for the EMMF and EMDF landfills which EPA and DOE have documented in

the two CERCLA RODs do not protect human health and the environment because the

CERCLA remedies at a minimum result in a cumulative risk in excess 1 x 10-4, outside

the established excess cancer risk defining acceptable risk in the NCP, and do not attain

readily available CWA TBEL, anti-degradation, properly calculated protective WQBEL,

and protection of designated use ARARs. EPA and DOE did not invoke or justify a

waiver of these CWA ARARs pursuant to CERCLA § 121(d)(4) or 40 CR § 300.430(f)

(1)(ii)(C). The CERCLA remedies selected by EPA and DOE in the EMWMF and

EMDF RODs do not utilize the best available treatment technology to the maximum

extent practicable.

260. Contrary to, and in violation of, the NCP requirements in 40 CFR §

300.430(f)(2), EPA and DOE failed to develop or identify an alternative incorporating the

best available treatment technology (e.g., ion exchange resin treatment technology) to

address effluent discharges from the EMWMF and EMDF landfills, even though that

alternative would ensure protectiveness of human health and the environment and would

attain all available ARARs, including the CWA TBEL, anti-degradation, properly

calculated protective WQBEL, and protection of designated use ARARs. EPA and DOE failed to present that alternative to the public in a proposed plan, and did not summarize information related to that alternative. EPA and DOE failed to prepare and make available to the public a final, approved RI/FS or FFS prior to publishing a proposed plan identifying and discussing a full range of alternatives to address wastewater discharges from the EMWMF and EMDF landfills under consideration (including the best available treatment technology), and how the full range of alternatives was evaluated under 40 CFR § 300.430(e)(9)(iii). EPA and DOE failed to provide any credible rationale for excluding an alternative employing the use of best available treatment technology to treat, to the maximum extent practicable, the effluent discharges contaminated with mercury, PCBs and radionuclides from the EMWMF and EMDF landfills going into Bear Creek and its downstream waters.

261. Contrary to, and in violation of, the NCP requirements in 40 CFR § 300.430(f)(3), EPA and DOE failed to provide any opportunity for the public to comment on a proposed plan and supporting analysis, including a final, approved and RI/FS or FFS, which identified and presented an alternative incorporating the best available treatment technology (e.g., ion exchange resin treatment technology) to address effluent discharges contaminated with mercury, PCBs and radionuclides from the EMWMF and EMDF landfills going into Bear Creek and its downstream waters.

262. Contrary to, and in violation of, the NCP requirements in 40 CFR § 300.430(f)(5), EPA and DOE failed to explain in the EMWMF ROD: 1) how the CERCLA remedy selected by EPA and DOE ensures protection of human health and the environment when no protective effluent discharge limits governing discharges of

mercury, PCBs, and radionuclides from the landfill into Bear Creek and its downstream waters have ever been developed and selected as part of a CERCLA remedy selection process or as part of a CWA § 402 permit; 2) how the CERCLA remedy selected is protective of human health and the environment when DOE has been illegally discharging effluent into Bear Creek for over twenty years, and in light of the fact that after the landfill began operating the State posted "Do Not Eat the Fish" signs on Bear Creek in 2016 because the State determined it is not safe to eat fish recreationally caught in that stream and its downstream waters (also posted with "Do Not Eat the Fish" signs); 3) how the CERCLA remedy selected attains all available ARARs, including the CWA TBEL, anti-degradation, properly calculated protective WQBEL, and protection of designated use ARARs; 4) how the CERCLA remedy selected by EPA and DOE  satisfies the preference for remedies employing treatment which permanently and significantly reduce the toxicity, mobility, or volume of the hazardous substances, to the maximum extent practicable; 5) why EPA and DOE selected a CERCLA remedy in EMWMF ROD which does not include the best available treatment technology (i.e., ion exchange resin treatment technology) to achieve reductions in toxicity, mobility, or volume.

263. Contrary to, and in violation of, the NCP requirements in 40 CFR § 300.430(f)(5), EPA and DOE failed to explain in the EMDF ROD: 1) how the CERCLA remedy selected by EPA and DOE ensures protection of human health and the environment when protective effluent discharge limits governing discharges of mercury, PCBs, and radionuclides from the landfill into Bear Creek and its downstream waters have not been developed and selected as part of a CERCLA remedy selection process; 2) how the CERCLA remedy selected is protective of human health and the environment

when the PRGs selected in the EMDF ROD result in a cumulative risk in excess 1 x 10-4,

outside the NCP's established excess cancer risk defining acceptable; 3) how the

CERCLA remedy selected attains all available ARARs, including the CWA TBEL, anti-

degradation, properly calculated protective WQBEL, and protection of designated use

ARARs; 4) how it satisfies the preference for remedies employing treatment which

permanently and significantly reduce the toxicity, mobility, or volume of the hazardous

substances, to the maximum extent practicable, since EPA and DOE have not identified,

developed and selected an alternative incorporating the best available treatment

technology (e.g., ion exchange resin treatment technology) as part of the CERCLA

remedy selection process; 5) why EPA and DOE selected a CERCLA remedy in the

EMDF ROD which does not include the best available treatment technology (e.g., ion

exchange resin treatment technology) to achieve reductions in toxicity, mobility, or

volume.

264. Contrary to, and in violation of, the NCP requirements in 40 CFR §

300.430(f)(1), EPA and DOE did not have the data and information needed to support

making a final remedy selection decision.  EPA and DOE openly admit in the EMDF ROD

itself that they have not collected critically important data and information needed to make a

final remedy selection decision on essential components of the cleanup.  The EMDF ROD

indicates that additional work needs to be done to prepare Waste Acceptance Criteria (WAC)

for what will be disposed of in the EMDF landfill, additional sampling is needed to fully

characterize the ground water table underneath that landfill, and that effluent "discharge

limits will be developed in the future, based on the remediation goals, when the specifics

of the EMDF landfill wastewater treatment systems are known, including the discharge

location," and that "[w]astewater discharge limits will be developed following completion of the engineering design, when additional information is available, and prior to operation of the facility." These relevant factors are all necessary to make a determination in a CERCLA ROD that the remedy selected complies with the requirements of CERCLA and the NCP, including but not limited to ensuring protectiveness of human health and the environment.

265. EPA and DOE clearly were not ready to make a final remedy selection decision in the EMDF ROD and cannot credibly determine whether they are actually ensuring protectiveness of human health and the environment by among other things, selecting a remedial action that will "fully protect" the designated use of Bear Creek and the recreational users of its waters, as required by CWA regulations published in 40 CFR § 122.44(d)(1)(vi)(A) and 40 CFR § 131.10 and § 131.11.

266. Contrary to EPA's long-standing, published policy statements and guidance documents, including but not limited to *RAGS, RI/FS* guidance and the *PRG Calculator for Radionuclides,* EPA and DOE have ignored and contradicted relevant factors and have given radionuclides the status of "preferred pollutants" by not subjecting them to the same CERCLA procedural and substantive cleanup approach as other hazardous substances. In so doing, EPA and DOE have arbitrarily and capriciously used the CERCLA remedy selection process to improperly allow the EMWMF and EMDF landfills to pose unacceptable risks to human health and the environment, as defined by the NCP.

**FIRST CLAIM FOR RELIEF**

**Violations of 42 U.S.C. § 9569(a)(1) – Violations of standards, regulations, and requirements which have become effective pursuant to CERCLA**

267. Plaintiffs incorporate by reference all paragraphs of this Complaint set out above as if fully set forth herein.

268. Citizen suits are authorized under 42 U.S.C. § 9659(a)(1) for "violation of any standard, regulation, condition, requirement, or order which has become effective pursuant to this chapter (including any provision of an agreement under section 9620 of this title, relating to Federal facilities)." (Parenthesis in original.)

269. EPA's and DOE's actions, including the issuance of the Wheeler Decision, have violated numerous CERCLA standards, regulations, conditions, and requirements in the selection and implementation of CERCLA response actions at ORR.  EPA and DOE violated mandatory duties in CERCLA § 121 and the NCP at 40 CFR § 300.400 and 300.430 by selecting and implementing CERCLA remedial actions for the EMWMF and EMDF landfills which do not attain all available CWA ARARs, do not incorporate the best available treatment technology, and do not ensure protectiveness of human health and the environment.  EPA and DOE have not published an explanation as to why the best available treatment technology (e.g., ion exchange resin treatment technology) is not being utilized.  EPA and DOE have not prepared Five Year Reviews explaining how the 1999 EMWMF ROD protects human health and the environment when the landfill has been illegally discharging mercury, PCBs and radionuclides into Bear Creek for over twenty years, and in light of the fact that the State posted "Do Not Eat the Fish" signs on Bear Creek in 2016.  As a result, EPA's and DOE's actions have not protected, and do not protect, the designated recreational use for, and users of, Bear Creek and its downstream

waters; that designated use was promulgated by the State pursuant to its delegated CWA authority.

270. EPA's and DOE's actions, including the issuance of the Wheeler Decision, have violated mandatory duties in CERCLA § 113 and § 117 and the NCP at 40 CFR § 300.430 by not following the required substantive requirements and procedural steps in the remedy selection process for the EMWMF ROD and the EMDF ROD. With regard to effluent discharge limits for discharges from the two ORR landfills into Bear Creek, EPA and DOE did not prepare and make available a complete proposed plan prior to issuing the EMWMF ROD or the EMDF ROD, nor did the agencies prepare and make available prior to such a proposed plan a complete, finalized and approved Remedial Investigation/Feasibility Study or Focused Feasibility Study, or information or reasonable explanation of the proposed plan and alternative proposals considered, and did not provide meaningful responses to significant comments made by interested parties regarding the lack of such effluent discharge limits and other deficiencies in the RI/FS, FFS and remedy selection process.

**SECOND CLAIM FOR RELIEF**

**Violations of 42 U.S.C. § 9569(a)(1) – Violations of the CERCLA § 120 Federal Facilities Agreement**

271. Plaintiffs incorporate by reference all paragraphs of this Complaint set out above as if fully set forth herein.

272. Citizen suits are authorized under 42 U.S.C. § 9659(a)(1) for "violation of any standard, regulation, condition, requirement, or order which has become effective

pursuant to this chapter (including any provision of an agreement under section 9620 of this title, relating to Federal facilities)." (Parenthesis in original.)

273. EPA and DOE have violated §§ III, XI, XII, XIV, XV, and XVI of the FFA by failing to carry out the CERCLA response actions at ORR in accordance with CERCLA, the NCP, EPA policies and guidance documents, and Tennessee law.

274. EPA's and DOE's actions, including the issuance of the Wheeler Decision, have not been in accordance with, and have violated, numerous CERCLA and NCP standards, regulations, conditions, and requirements in the selection and implementation of CERCLA response actions at ORR.  EPA and DOE violated mandatory duties in CERCLA § 121 and the NCP at 40 CFR § 300.400 and 300.430 by selecting and implementing CERCLA remedial actions for the EMWMF and EMDF landfills which do not attain all available CWA ARARs, do not incorporate the best available treatment technology, and do not ensure protectiveness of human health and the environment.  EPA and DOE have not published an explanation as to why the best available treatment technology (e.g., ion exchange resin treatment technology) is not being utilized.  EPA and DOE have not prepared Five Year Reviews explaining how the 1999 EMWMF ROD protects human health and the environment when the landfill has been illegally discharging mercury, PCBs and radionuclides into Bear Creek for over twenty years, and in light of the fact that the State posted "Do Not Eat the Fish" signs on Bear Creek in 2016.  As a result, EPA's and DOE's actions have not protected, and do not protect, the designated recreational use for, and users of, Bear Creek and its downstream waters; that designated use was promulgated by the State pursuant to its delegated CWA authority.

275. EPA's and DOE's actions, including the issuance of the Wheeler Decision, have not been in accordance with, and have violated, mandatory duties in CERCLA § 113 and § 117 and the NCP at 40 CFR § 300.430 by not following the required substantive requirements and procedural steps in the remedy selection process for the EMWMF ROD and the EMDF ROD. With regard to effluent discharge limits for discharges from the two ORR landfills into Bear Creek, EPA and DOE did not prepare and make available a complete proposed plan prior to issuing the EMWMF ROD or the EMDF ROD, nor did the agencies prepare and make available prior to such a complete proposed plan a complete, finalized and approved Remedial Investigation/Feasibility Study or Focused Feasibility Study, or information or reasonable explanation of the proposed plan and alternative proposals considered, and did not provide meaningful responses to significant comments made by interested parties regarding the lack of such effluent discharge limits and other deficiencies in the RI/FS, FFS and remedy selection process.

276. EPA's and DOE's actions in selecting and implementing CERCLA response actions at ORR, including the issuance of the Wheeler Decision, have not been in accordance with the EPA policy statements and guidance documents summarized in paragraphs 33, 68, 69, and 90-137.

## THIRD CLAIM FOR RELIEF

**Violations of 42 U.S.C. § 9569(a)(2) – Failure to Perform Non-Discretionary Acts and Duties under CERCLA**

277. Plaintiffs incorporate by reference all paragraphs of this Complaint set out above as if fully set forth herein.

278. Plaintiffs may commence a civil action against any officer of the United States where there is "a failure of the President or of other such officer to perform any act or duty under this Act, including an act or duty under § 120 (relating to federal facilities), which is not discretionary," pursuant to 42 U.S.C. § 9659(a)(2) (parenthesis in original).

279. EPA's and DOE's actions, including the issuance of the Wheeler Decision, have not been in accordance with, and have violated, numerous CERCLA and NCP standards, regulations, conditions, and requirements in the selection and implementation of CERCLA response actions at ORR. As a result, EPA and DOE have failed to perform non-discretionary acts and duties under CERCLA § 121 and the NCP at 40 CFR § 300.400 and 300.430 by selecting and implementing CERCLA remedial actions for the EMWMF and EMDF landfills which do not attain all available CWA ARARs, do not incorporate the best available treatment technology, and do not ensure protectiveness of human health and the environment. EPA and DOE have failed to perform non-discretionary acts and duties under CERCLA § 121 and the NCP at 40 CFR § 300.430 by not publishing an explanation as to why the best available treatment technology (e.g., ion exchange resin treatment technology) is not being utilized. EPA and DOE have failed to perform non-discretionary acts and duties under CERCLA § 121 and the NCP at 40 CFR § 300.430 by not preparing Five Year Reviews explaining how the 1999 EMWMF ROD protects human health and the environment when the landfill has been illegally discharging mercury, PCBs and radionuclides into Bear Creek for over twenty years, and in light of the fact that the State posted "Do Not Eat the Fish" signs on Bear Creek in 2016. As a result of the failure to perform these non-discretionary acts and duties, EPA and DOE have not protected, and do not protect, the designated recreational use for, and

users of, Bear Creek and its downstream waters; that designated use was promulgated by the State pursuant to its delegated CWA authority.

280. EPA's and DOE's actions, including the issuance of the Wheeler Decision, have not been in accordance with, and have violated, mandatory duties in CERCLA § 113 and § 117 and the NCP at 40 CFR § 300.430 by not considering and following the required substantive requirements and procedural steps in the remedy selection process for the EMWMF ROD and the EMDF ROD. With regard to effluent discharge limits for discharges from the two ORR landfills into Bear Creek, EPA and DOE did not prepare and make available a proposed plan prior to issuing the EMWMF ROD or the EMDF ROD, nor did the agencies prepare and make available prior to such a complete proposed plan a finalized and approved Remedial Investigation/Feasibility Study or Focused Feasibility Study, or information or reasonable explanation of the proposed plan and alternative proposals considered, and did not provide meaningful responses to significant comments made by interested parties regarding the lack of such effluent discharge limits and other deficiencies in the RI/FS, FFS and remedy selection process. In so doing, EPA and DOE have failed to perform non-discretionary duties under CERCLA and the NCP.

**FOURTH CLAIM FOR RELIEF**

**Violations of the Administrative Procedure Act (APA)**

281. Plaintiffs hereby reallege and incorporate by reference each allegation contained in the preceding paragraphs as if fully set forth herein.

282. EPA and DOE are each an "agency" as defined by 5 U.S. Code § 551(1)(E).

283. Pursuant to 5 U.S.C. § 706(2)(A), agency actions, findings, and conclusions must not be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

284. As described above, the actions and inactions by EPA and DOE at ORR, including the issuance of the Wheeler Decision and the statutory and regulatory interpretations and conclusions made therein, were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  To the extent EPA's and DOE's decisions, actions, and inactions in selecting and implementing CERCLA response actions, as described above, were discretionary, they were arbitrary, capricious, an abuse of discretion and not in accordance with CERCLA, the NCP and long-standing, published national EPA policy statements and guidance documents.  EPA and DOE provided no reasoned explanations, or supporting data and information in the Administrative Record, for the numerous decisions, actions and inactions which deviated from EPA's long-standing, published national policy statements and guidance documents.

285. EPA, as an administrative agency, is required to adhere to its own rules, regulations, long-standing published national policies, guidances and procedures when making oversight and remedy selection-related decisions under CERCLA and the NCP pursuant to the FFA.  EPA's decisions, actions and inactions failing to properly oversee DOE's CERCLA response actions at ORR and to ensure the proper administration of federal environmental laws EPA is responsible for implementing are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

## REQUEST FOR RELIEF

Based upon the foregoing, the Plaintiffs request relief from the court as follows:

A. Declare that EPA and DOE have violated CERCLA § 120, § 121, § 113 and § 117 and have violated the NCP's requirements in 40 CFR § 300. 400 and §300.430;

B. Declare that EPA and DOE have violated terms of the FFA requiring EPA and DOE implement CERCLA response actions at ORR in accordance with CERCLA, the NCP, EPA policy and guidance, and Tennessee law;

C. Declare that EPA and DOE have failed to perform the nondiscretionary duties described above;

D. Declare that EPA's and DOE's CERCLA response actions related to the EMWMF and EMDF landfills, including the issuance of the Wheeler Decision, are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A) and CERCLA § 113.

E. Declare that the Wheeler Decision is arbitrary, capricious, an abuse of discretion and not otherwise in accordance with law;

F. Declare that the EMDF ROD is arbitrary, capricious, an abuse of discretion and not otherwise in accordance with law;

G. Vacate and set aside the Wheeler Decision and the EMDF ROD;

H. Declare that the 2019 RA Decision is legally correct and shall serve as the final basis for resolving the wastewater dispute initiated by the State in 2016 and as the basis for a new CERCLA remedy selection process for the EMWMF and EMDF landfills;

I. Order EPA and DOE to initiate a new CERCLA remedy selection process for the EMDF landfill which follows and fully complies with the substantive and procedural requirements of CERCLA and the NCP, and is done using EPA's

94

methodology published in its guidance and policy, including the preparation of a new RI/FS or FFS prior to publication of a new proposed plan and issuance of a new ROD which: 1) includes complete and scientifically credible information regarding baseline risk, human health risk (including the proper consideration and evaluation of the fish ingestion pathway) WAC, and ground water characterization demonstrating that the EMDF landfill will not leak or otherwise release hazardous substances, including PCBs, into the aquifer below and adjacent to the proposed landfill; 2) attains all available CWA ARARs, including regulations governing TBELs, anti-degradation, properly calculated protective WQBELs and the full protection of the designated recreational use of Bear Creek and its downstream waters; 3) incorporates the best available treatment technology (e.g., ion exchange resin treatment technology); and 4) ensures protectiveness of human health and the environment.

J.  Order EPA and DOE to immediately begin treatment of effluent discharges from the EMWMF landfill using mobile ion exchange resin treatment units DOE has used at ORR and at its Paducah, KY facility, and meeting the most stringent effluent discharge limits which have been achieved by those mobile treatment units;

K.  Order EPA and DOE to initiate a new CERCLA remedy selection process for the EMWMF landfill which follows and fully complies with the substantive and procedural requirements of CERCLA and the NCP, including the preparation of a new RI/FS or FFS prior to publication of a new proposed plan and issuance of a new ROD, which selects remedial actions that will restore Bear Creek and its

downstream waters to their designated recreational use, including cleanup of sediments and riverbanks that have been contaminated by the illegal effluent discharges from the EMWMF landfill for over twenty years and other DOE actions and inactions at the Y-12 portion of ORR;

L.  Order EPA and DOE to fully and faithfully comply with the terms of the FFA and with the agencies' mandatory and non-discretionary duties for all ongoing and future CERCLA response actions at ORR;

M.  Retain jurisdiction over this matter for purposes of enforcing and effectuating the Court's opinion;

N.  Award Plaintiffs their reasonable fees, costs, expenses, and disbursements, including attorney's fees, associated with this litigation; and

O.  Grant such additional and further relief as the Court may deem just, proper, and necessary, including appropriate relief in accordance with the Court's opinion to ensure that EPA and DOE comply with the laws they have been entrusted to carry out for the benefit and protection of the public.

/ s/ Terry J. Lodge
Terry J. Lodge
316 N. Michigan St, Suite 520
Toledo, Ohio 43604
419-205-7084
(Fax) 419-932-6625
e-mail: tjlodge50@yahoo.com

/ s/ Wallace L. Taylor[*]
Wallace L. Taylor
4403 1st Ave. N.E., Suite 402
Cedar Rapids, Iowa 52402
319-366-2428
(Fax) 319-366-3886
e-mail: wtaylorlaw@aol.com

[*](Motion for admission *pro hac vice* pending)

CO-COUNSEL FOR PLAINTIFFS